### UNITED STATES v. FT. SMITH & W. R. CO.

#### (Circuit Court of Appeals, Eighth Circuit. February 28, 1912.)

#### No. 3,618.

#### (Syllabus by the Court.)

EMINENT DOMAIN (§ 152*)—LANDS—RIGHT OF WAY—COMPENSATION.

 Where a railroad company is compelled to, and does, pay to allottees of lands in the Creek Nation full compensation for the taking of its right of way and the construction of its railroad across their allotments, and that right of way was not located over such allotments until after the allottees had become the exclusive owners thereof, such company is not liable under Act March 3, 1899, c. 453, 30 Stat. 1368, to pay to the Creek Nation, or to the United States for that nation, $50 per mile, or any other sum, on account of its railroad right of way across such allotments.

 [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 403–406, 426; Dec. Dig. § 152.*]

In Error to the Circuit Court of the United States for the Eastern District of Oklahoma.

Action by the United States of America against the Ft. Smith & Western Railroad Company. Judgment for defendant, and plaintiff brings error. Affirmed. ·

William J. Gregg, U. S. Atty.

Charles E. Warner, for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge. Is the Ft. Smith & Western Railroad Company liable to pay to the Creek Nation $50 per mile on account of the construction of its railroad across allotments to members of the Nation of which the allottees had become owners to the exclusion of the Nation before the company definitely located its railroad, in cases in which it has been compelled to compensate and has compensated the allottees for its right of way over such allotments? The court below answered this question in the negative and its decision is specified as error.

By section 1 of the act of March 3, 1899 (chapter 453, 30 Stat. 1368), Congress granted to the railroad company the franchise to construct, maintain, and operate its railroad through the Creek Nation. By sections 2, 3, 4, and 7 it authorized that railroad company to exercise the power of eminent domain to take and use its right of way through that nation on condition that it should make full compensation to the owners and occupants of the lands over which it was constructed therefor. At the time this act was passed the title to all the lands in the Creek Nation was in that tribe which held it in trust for all its members in common, but some of the members had made improvements upon and had the right to occupy respectively specific tracts thereof. Sections 3 and 4 merely provided that, before the company should construct its railroad through any of these lands held by individual occupants according to the laws, usages, and customs of the Creek Nation, or under any law or treaty of the United States, compensation should be made to such occupants for all their property to be taken or damage to be done to them by reason of such construction, that, in case the parties could not agree upon the amount of this compensation, referees should fix it, and either party could appeal from their award to the United States court where the case should proceed to trial and determination as an ordinary civil action. Section 7 required the Railroad Company to pay for the benefit of the Creek Nation, which held the title to these lands, to those occupied and improved by individuals, as well as to those that were unoccupied, in addition to the compensation to be paid to the individual occupants, none of whom had any title to the land in their possession, $50 for each mile of railroad the company should construct through the Creek Nation, but that, if the General Council of the Nation should dissent from this allowance, the compensation to be paid to the Nation should be fixed by referees and by the court as provided by the act for the determination, under like circumstances, of the compensation to be paid to individual occupants.

On March 2, 1899, the day before the passage of the act which has been recited, Congress granted to this and to other railroad companies similarly situated the power of eminent domain to take rights of way through any land held by any Indian tribe and through any Indian reservation in the territory, on condition that it should make compensation therefor to the Nation, to any occupant and to any allottee, for the damage resulting from the taking of the right of way and the construction of the railroad, and it prescribed the same method of fixing the amounts of damages in cases of disagreement specified in the act of March 2, 1899 (chapter 374, 30 Stat. 990, §§ 1, 2).

Under the Creek allotment agreement which was ratified by the United States by Act March 1, 1901, c. 676, 31 Stat. 861, and by the Creek Nation on May 25, 1901, when it first became effective, citizens of the Creek Nation in possession of lands therein were given the right in preference to others to have such lands allotted to themselves and to the members of their families, and any uncontested allotments made prior to May 25, 1901, were confirmed (section 6). An allotment of 160 acres to each member of the Creek Nation was

authorized (sections 3, 4, and 5). All lands to which on May 25, 1901, "any railroad company may, under any treaty or act of Congress, have a vested right for right of way," were reserved (section 24), and the titles of the allottees were declared to be inalienable for five years, except with the approval of the Secretary of the Interior (section 7). The titles of allottees, with the exception last noted, were perfect and exclusive of any title in the Creek Nation.

The right and title to the allotments over which the right of way is here in question had vested in the allottees under this legislation and the Creek Nation had parted with all its title thereto subsequent to the act of March 3, 1899, granting to the railroad company its right to construct a railroad through the Creek Nation and prior to June 20, 1901, when the Railroad Company first filed its map of definite location of its railroad across these allotments. The Railroad Company has been compelled to pay, and it has paid, full compensation for the damage to the title of these allottees, the exclusive owners of the allotments, caused by the taking and using of its right of way over them, as it was compelled to do by Act March 3, 1899, c. 453, 30 Stat. 1369, § 3, and by Act March 2, 1899, 30 Stat. 991, § 3, before it could construct its railroad upon them. Why should it also pay to the Creek Nation a compensation of $50 per mile, or any other sum, for this right of way over these allotments of the title to which the Nation had divested itself, and in which it had no pecuniary interest at or after the time when the company located its right of way thereon? Counsel for the government answers that the $50 per mile was in the nature of compensation for the privilege of running a railroad through the Creek Nation rather than for the value of the land taken for its right of way, or for the damages resulting from such taking, that the requirement of its payment was independent of and disconnected with the compensation to be made to occupants, and that no entry to construct the railroad could be made without paying for it. But does the act of March 3, 1899, sustain this position? Section 1 of that act grants the privilege of constructing and operating a railway through the Creek Nation without limit or condition, and the act contains no requirement of the payment of anything whatever therefor. The Creek Nation owned the title to all the lands within it, and individuals owned the improvements and the rights to occupy some of these lands. The taking and the use of a railroad right of way would damage the title, the improvements, and the right of occupancy, and it was rational legislation demanded by the Constitution to require full compensation to be made for all this injury as a condition of the taking. The second, third, and seventh sections of the act merely granted, not the right of way through these lands, but the right to exercise the power of eminent domain, the power "to take and use for all purposes of a railway  *  *  *  and right of way," upon condition that full compensation should be made, first, to the Nation for injury to its title, and, second, to individuals for injury to their improvements and their rights of occupancy. These sections provided that, if the Creek Nation did not object, $50 per mile should constitute full compensation for the damage to its title, but that, if it dissented, "all compen-

sation to be paid to said Nations under the provisions of this act shall be determined as provided in section 3, for the determination of compensation to the individual occupants of lands." Concede, as counsel contends, that the Railroad Company had no right to enter upon the land to construct its railway until compensation for damage to the title was paid, and the analogy between the requirement of compensation for damage to the title and the requirement for compensation for damage to the improvements and the right of occupancy is complete. And the conclusion is logical and unavoidable that the $50 per mile was not a tribute to be paid to the Nation for the privilege of running a railroad through the land, a privilege which the Railroad Company, in common with other companies similarly situated, already had without price under the act of March 2, 1899 (30 Stat. 990), but it was compensation for the damage that might be caused to the title held by the Nation of the lands over which the railroad might take its right of way, while the compensation to individuals was for the damage to their improvements and rights of occupancy, that the amount of each was to be determined by the same method and the aggregate of both constituted that full compensation which the Constitution and the acts of Congress required the company to make.

But counsel cites decisions in Railroad Company v. Baldwin, 103 U. S. 426, 430, 26 L. Ed. 578, Nielsen v. Northern Pacific R. Co., 184 Fed. 601, 106 C. C. A. 581, and in like cases to the effect that the grants of rights of way there considered were in præsenti, and all parties taking public lands subsequent to those grants took subject to them, and he argues that the grant in the act of March 3, 1899, was of the same character, that it vested in the Railroad Company the right of way over these allotments at the time it was enacted, that this right of way was reserved from these allottees by section 24 of the act of March 1, 1901, and that the allottees took no title to the land on which it was subsequently located, but that title remained in the Creek Nation. The grants under consideration in the cases cited, however, were absolute grants by the United States of rights of way over lands which the United States owned. It did not own the lands of the Creek Nation, and its act of March 3, 1899, did not grant any right of way through them. It merely gave to the Railroad Company the power of eminent domain, the power to take a right of way over these lands from third parties, and the occupants of them upon payment of full compensation to them therefor. The right of way under this act, therefore, never vested in the Railroad Company until it filed its map of definite location on June 20, 1901, and made or secured to the owners and occupants payment of compensation for its taking. Counsel calls attention to the fact that the lands were not alienable by the allottees until May 26, 1906, except with the approval of the Secretary of the Interior. But the Railroad Company obtained from these allottees and paid them for its right of way over these allotments and the legal presumption in the absence of pleading and proof to the contrary is that it did so lawfully, and, if that were necessary, that the Secretary approved their conveyances to it of these rights. The act of March 3, 1899, however, authorized the Railroad Company to take this right

of way over these lands upon payment of full compensation and the receipt by the allottees of such compensation secured to the Railroad Company this right of way under the law without any other conveyances from the allottees.

The United States brings this action in the right of the Creek Nation. It has no other right and no pecuniary interest in these allotments, or in the compensation for the right of way over them for which this action is prosecuted. It therefore stands in the shoes of that Nation, and an estoppel of the Creek Nation is an estoppel of the United States. Before the Railroad Company located its right of way upon these allotments, the Creek Nation had divested itself of all title and interest in them, and had vested its title to them in the allottees. It had thereby estopped itself from collecting of the Railroad Company this $50 per mile for the injury caused by the right of way to its title to these allotments because under the acts of Congress it had transferred from itself to its allottees the right and the power to compel the Railroad Company to pay them full compensation for this injury to the title to the allotments, and had divested itself of all right to give any consideration whatever in return for any payment the company might make to it on that account. The United States was not entitled to recover for the Creek Nation this $50 per mile for the railroad right of way over these allotments because this compensation was provided by the act of March 3, 1899, for the injury to the title to the allotments caused by the taking of the right of way over them, the Creek Nation had divested itself of that title, and had vested it in the allottees before the right of way was located upon them or taken from them, and the Creek Nation was therefore estopped from recovering compensation for injury which it could not suffer.

The judgment below is affirmed.