STEPHENSON et al. v. ST. LOUIS SOUTH-WESTERN RY. CO. OF TEXAS et al.* (No. 7308.)

(Court of Civil Appeals of Texas. Dallas. Dec. 4, 1915. Rehearing Denied Jan. 8, 1916.)

1. RAILROADS ⟐73—RIGHTS OF WAY—LEASES OF.

A railroad company which owns the fee of its right of way may lease it to others for any legitimate purposes not connected with its use

---

⟐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Application for writ of error pending in Supreme Court.

for railroad purposes; Rev. St. 1911, art. 6532, providing that the right of way secured by any railroad company in the manner provided by law shall not be construed to include the fee of the land, and section 6542, that railways shall not have the power to construct any buildings to be occupied by employés or others along the right of way, except at their respective depot stations and station houses, not applying to where the railroad company has obtained the fee.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 179–182; Dec. Dig. ☞73.]

2. RAILROADS ☞73—RIGHTS OF WAY—RIGHT TO—"GRANT, SELL, AND CONVEY."

The owner of a parcel of land granted to a railroad company the right to construct and forever operate its railroad over and across the land, which right should be forfeited in the event of the railroad company's failure to construct and operate its road. After the grant of the right of way the owner sold the fee of her lands to a third person, who in turn conveyed them to another. The second grantee, who held the fee, platted a town on the property and conveyed to the railroad company an enlarged right of way and a parcel of land for a station. Held, that by such grant, which used the words "grant, sell, and convey," the railroad company acquired the fee to its right of way, and could use portions of the right of way for any purpose desired, regardless of the limitations in the first grant.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 179–182; Dec. Dig. ☞73.]

3. EASEMENTS ☞1 — WHAT ARE — "EASEMENT"—"SERVITUDE."

An "easement" is a right which one proprietor has to some profit, benefit, or lawful use out of or over the estate of another proprietor; while a "servitude" is the burden imposed on one tract of land for the benefit of another.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 1, 2, 5–7; Dec. Dig. ☞1.

For other definitions, see Words and Phrases, First and Second Series, Easement; Servitude.]

4. EASEMENTS ☞1—CREATION—GRANT.

Easements or servitudes may arise by deed or express grant, by prescription, by oral covenants, and by implication.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 1, 2, 5–7; Dec. Dig. ☞1.]

5. RAILROADS ☞73—RIGHT OF WAY—USE—EASEMENT.

An attorney who, with the sanction of a railroad company, had undertaken to buy lands adjacent to the proposed line of railway suitable for town or village sites, acquired a parcel of land over which the railroad company already had a right of way. He thereupon conveyed in fee to the railroad company an enlarged right of way, together with land for a depot. Simultaneously with the execution and delivery of the deed, the consideration for which was the location of a station at that point, the attorney granted to the railroad company the right to dam a water course forming a pond. The railroad company and the inhabitants of the town were granted the right to use the waters of the pond; the railroad company being given priority. A town site was platted on the remaining land, the map showing the dedication of the pond to the railroad company and the public, and the arrangement of the streets, blocks, and lots with reference to the railroad company's right of way. Held that, though lots were sold pursuant to the plat, the attorney could not after his grant create any easement in or servitude upon the right of way; consequently purchasers from the attorney had no right to demand that the railroad company use its right of way only

for railroad purposes, and not to lease same for other purposes.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 179–182; Dec. Dig. ☞73.]

6. APPEAL AND ERROR ☞742—PRESENTATION OF GROUNDS OF REVIEW IN COURT BELOW—EXCEPTIONS—NECESSITY.

Where appellant did not reserve appropriate exceptions, assignments complaining of the refusal of the charges cannot be considered as propositions of law under other assignments of error; for that would be a mere evasion of the practice acts requiring exceptions.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. ☞742.]

7. APPEAL AND ERROR ☞742—ASSIGNMENTS OF ERROR—PROPOSITIONS.

Assignments which do not present error cannot be considered as propositions of law under other assignments; for they would not be germane to the assignments to which they were sought to be subjoined.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. ☞742.]

8. APPEAL AND ERROR ☞248—PRESENTATION OF GROUNDS OF REVIEW IN COURT BELOW—NECESSITY.

An assignment that a contract whereby a railroad company leased part of its right of way to a lumber company was invalid as tending to create restrictions in the free pursuit of the transportation of lumber and to stifle competition presents a fundamental error which may be considered, although the matter was not presented by appropriate exceptions to refusal of a special charge declaring the lease to be void.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1432, 1435–1439, 1443, 1447–1452, 1454–1459, 1462, 1464–1468; Dec. Dig. ☞248.]

9. APPEAL AND ERROR ☞173 — DETERMINATION—QUESTIONS TO BE CONSIDERED.

It is the policy of appellate courts to consider whether contracts between carriers and others are void as tending to stifle competition and work undue discrimination, whether presented in the trial or appellate courts.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1079–1089, 1091–1093, 1095–1098, 1101–1120; Dec. Dig. ☞173.]

10. MONOPOLIES ☞16 — "TRUST" — WHAT CONSTITUTE.

Rev. St. 1911, art. 7796, defines a "trust" as a combination of capital, skill, or acts by two or more persons to create or carry out restrictions in trade or commerce or aids to commerce or in the free pursuit of business, or to prevent or lessen competition in the manufacture, making, transportation, sale, or purchase of merchandise, or in the preparation of any produce for market or transportation. A railroad company leased part of its right of way to a lumber company under a contract providing that the company should deliver to the railroad company for transportation all freight consigned to the lumber company which might be transported by rail, provided that the rates over the railroad company's routes should equal those of its competitors; the purpose being that the railroad company should have the longest available haul of freight over its own lines. The agreement further required the lumber company to consign to the railroad all freight which it might have at any time to be transported or shipped, and that failure to comply with those stipulations should give the railroad company the right to terminate the agreement. Held that, as the lumber company was not bound to ship its freight over the line of the railroad company unless its rates should equal the rates of competing carriers, and as the railroad company might not be able to meet competition, the agreement was not invalid

within the statute, as intended to stifle competition.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. ☞16.

For other definitions, see Words and Phrases, First and Second Series, Trust.]

Appeal from District Court, Navarro County; H. L. Stone, Special Judge.

Action by C. C. Stephenson and others against the St. Louis Southwestern Railway Company of Texas and others. From a judgment for defendants, plaintiffs appeal. Affirmed.

Richard Mays, of Corsicana, for appellants. E. B. Perkins and D. Upthegrove, both of Dallas, and R. S. Neblett and Callicutt & Johnson, all of Corsicana, for appellees.

RASBURY, J. The appellants in the court below, consisting of a number of citizens of the town of Frost, in their own behalf and that of the citizenship of Frost, sued the St. Louis Southwestern Railway Company of Texas, the Frost Lumber Company, and L. A. Morgan, seeking, pending trial, a temporary injunction, and upon trial a perpetual injunction restraining the St. Louis Southwestern Railway Company of Texas from leasing to Frost Lumber Company a portion of its right of way in the town of Frost and restraining the Frost Lumber Company from erecting thereon buildings, sheds, fences, etc., wherein and whereon to conduct a lumber business. The right of injunction was based upon the claim by appellants that the right of way of the railroad could in no respect be used for purposes other than railroad purposes and upon the claim that the predecessors in title of appellee St. Louis Southwestern Railway Company of Texas had acquired their right of way in such manner as gave appellants and the citizens of Frost an easement or servitude thereon, which would be interfered with by constructing the proposed lumber sheds thereon.

Upon presentation of the petition, on August 26, 1913, to the district judge, Hon. H. B. Daviss, in vacation, the temporary writ of injunction was directed to and did issue at that time. The matter remained in the attitude just related until December 9, 1913, at which time Hon. H. L. Stone, selected as special district judge to try the case, Judge Daviss having recused himself because related within the prescribed degree of consanguinity to one of the appellants, upon full hearing dissolved the temporary injunction authorized by Judge Daviss, but, as such special judge, directed the issue of a similar writ, which remained in force until final trial of the case.

The pleadings of the parties in the court below sufficiently raised all issues presented in their respective briefs, and for that reason we deem it unnecessary to detail same, save to say that appellee St. Louis Southwestern Railway Company of Texas alleged that it was the owner in fee of the lands constituting its right of way through the town of Frost and privileged to make any lawful use thereof, and that the building thereon of lumber sheds and leasing same was such lawful use, and save also that before final trial appellee Frost Lumber Company, by proper plea, alleged that it was damaged by the issuance of the temporary writ of injunction, and sought to recover in that behalf certain specified items of damage.

There was jury trial, and upon conclusion of the evidence and upon motion of appellees the trial judge peremptorily instructed the jury to return verdict for appellees on the issue of perpetual injunction. The issue of damages against appellants was submitted to the jury, who returned a verdict for appellees Frost Lumber Company and against appellants in the sum of $562.50. Judgment was accordingly entered dissolving the temporary injunction and refusing a permanent one against appellees, and also in favor of Frost Lumber Company for its damages found by the jury, and from which judgment appellants have appealed to this court.

There are in the record certain undisputed facts which, in our opinion, control the disposition of the assignments of error challenging the action of the court in peremptorily instructing the jury to find against appellants' prayer for permanent injunction, and which are, in substance, as follows: In the year 1887 the St. Louis, Arkansas & Texas Railway Company proposed and undertook to build, construct, and operate a line of railway between the towns of Corsicana and Hillsboro, and for that purpose sought to and did secure from those over whose lands the proposed railway passed the right of way therefor. Bryant T. Barry, then residing in Corsicana, was local attorney there for the railway company. Barry, with the consent and sanction of the railway company, undertook to buy lands along and adjacent to the proposed line of railway suitable for town or village sites, and which lands were ultimately to be platted and sold to those who might desire to purchase same. The railway company was not interested in a financial way in the enterprise, neither contributing money with which to purchase the proposed town sites nor entitled to any profits derived therefrom or liable for any losses which might result. It was, however, agreed between the railway company and Barry that before the railway company would consent to or sanction the location of such town sites on its right of way such town sites should be platted or arranged according to a standardized plan or drawing prepared by its engineer; further, that in acquiring lands for town sites Barry would acquire sufficient to meet the requirements of the railway company, and would, in addition, donate to the company free a right of way over such lands sufficient for its line of railway, switches, depot, etc. For the sake of brevity we anticipate events at this point in our statement to say that the evidence discloses that the railroad was con-

structed and put in operation, being now operated as the St. Louis Southwestern Railway Company of Texas, one of the appellees, and that the town of Frost, in Navarro county, was located on said line of railway, and that it is upon the railroad right of way through said town of Frost that it was proposed to build the lumber sheds in which to conduct a lumber business, and which appellants sought to prevent by perpetual injunction. The town of Frost and the right of way of the railway company, the right to the use of which is in dispute, is situated in the southwest corner of the Noah Kizziah survey, in Navarro county, on lands owned in the year 1887 by Mrs. M. E. Goodloe. By conveyance dated July 20, 1887, but acknowledged August 27th following, Mrs. Goodloe granted the railway company the right of way upon a strip of land 100 feet wide across and over her lands in the said survey. The consideration of the grant was recited to be $350 and the construction and operation of a railroad over the land. On August 27, 1887, Mrs. Goodloe, in consideration of $2,844, conveyed to R. J. Sanders the fee, without restriction or limitation, to all her lands in the Noah Kizziah survey, amounting to 190 acres, which included the 100-foot strip granted the railway company by her, and which included the land upon which the town of Frost and the present right of way of the railway company is now situated. On August 31, 1887, Sanders, in consideration of $2,250, conveyed to Bryant T. Barry the fee of 150 acres of the land acquired from Mrs. Goodloe, also without restriction or limitation. The 150 acres so conveyed to Barry by Sanders included within its bounds the strip or right of way granted by Mrs. Goodloe to the railway company, as well as the land upon which the town of Frost and the right of way of the railway company is now situated. After acquiring the 150 acres from Sanders, Barry furnished the field notes therefor to the railway company's engineer, who, in accordance with the arrangement between Barry and the company, platted the town, showing the arrangement of its streets, blocks, and lots, as well as the company's right of way through the proposed town. On March 17, 1888, out of the 150 acres of land acquired by Barry in the manner just related he conveyed to the railway company the fee to a strip of land 300 feet wide and approximately 3,200 feet long. The consideration for the execution of the deed was the location and maintenance of a depot by the railway company upon the land so conveyed. Simultaneously with the execution and delivery of the deed conveying the right of way Barry executed another conveyance to the railway company, by the terms of which he granted the railway company, upon damming a water course, the right to overflow certain of the lands he had acquired from Sanders and adjacent to the company's right of way by which a pond or lake would be created, the first use of the waters of

which was conferred upon the railway company, and then upon the citizens of Frost, etc. See Gillean v. City of Frost, 25 Tex. Civ. App. 371, 61 S. W. 345. Prior to the time Barry made either of the foregoing deeds to the railway company he had, in pursuance with his arrangement with the company, furnished its engineer with the field notes of the land acquired by him, and the engineer had made the map referred to above, which Barry had reproduced and distributed over the country as showing the town of Frost and the manner in which the railway company's right of way was located, the map showing also the public pond dedicated to the railway and the town by Barry. It is also true that before Barry executed the two foregoing deeds the railroad had been built and was in operation, and that Barry had sold as many as three of the lots delineated on said map, but not to any of the appellants or their predecessors in title. It is also true that the property of appellants in this suit does not abut upon the railway company's right of way, but faces upon a street which is 60 feet wide and parallels the right of way under discussion. At the time of filing the instant suit and at the time the temporary injunction was issued at the request of appellants appellee railway company had leased a portion of its right of way to appellee Frost Lumber Company, who was preparing to erect thereon certain lumber sheds to be used by Frost Lumber Company in storing its lumber, and from which place said lumber company intended to conduct a private retail lumber business.

Appellants' first and second assignments of error challenge the action of the trial court in peremptorily directing verdict for appellees on the issue of perpetual injunction, and the first proposition thereunder is that the several deeds set out in our statement of the facts vested in appellee railway company a right of way over the lands therein described, and hence did not authorize the use of the right of way for the purpose of conducting thereon a private commercial enterprise.

[1] Confining ourselves to the exact issue raised by the proposition just stated, it is safe to assert that all authorities agree that, whenever a railway company is the owner of the fee in lands constituting its right of way, it may in reference thereto clearly exercise the rights and powers "usually incident to such ownership * * * in any manner not hurtful to others, and the right to lease it to others and therefrom derive profit is an incident of such ownership." Calcasieu Lumber Co. v. Harris, 77 Tex. 18, 13 S. W. 453. The rule quoted is not affected by article 6532, R. S. 1911, which, in substance, provides that the right of way secured by any railway in this state "in the manner provided by law shall not be construed to include the fee in lands," nor by article 6542, R. S. 1911, which provides, among other things, that:

Railways shall not have power "to construct any buildings along the line of their railroad to

be occupied by their employés or others, except at their respective depot stations and section houses, and at such places only such buildings as may be necessary for the transaction of their legitimate business operations, and for shelter of their employés."

Statutes of substantially similar import were in existence at the time the opinion was written in Calcasieu Lumber Co. v. Harris, supra, and are quoted in full in the opinion. The court bases its holding in that case on the ground that, railways being authorized by statute to acquire the fee in lands by voluntary grant to aid in the construction of their roads, as they are also now authorized to do (articles 6538, 6539, R. S. 1911), the provision of the statute necessarily has reference only to lands or rights of way upon which they only have an easement, and not that they may not in any event acquire a greater estate therein.

[2] Such being the rule, our duty narrows to an examination of the chain of title by which appellee railway company holds the right of way and its rights thereunder. As shown in our statement of the essential and undisputed facts, Mrs. Goodloe was originally the owner of the fee in the right of way lands in controversy in this suit, a conveyance of which she made to the St. Louis, Arkansas & Texas Railway Company. This conveyance, as shown by our statement, was clearly but an easement or right of way over the lands, since the most the deed granted was "the right to construct and forever operate its railroad over and across said land," and which was to be forfeited in the event the railroad failed to so construct and operate its road. After the grant of the easement or right of way by Mrs. Goodloe to the railway company she sold and conveyed to Sanders the fee in all her lands in the Kizziah survey, which included the land over which she had granted the easement to the railway company, following which was the deed from Sanders to Barry and from Barry to the railway company, by which the fee to the lands constituting the right of way of the railway company was passed first to Barry, and in turn by Barry to the railway company. , That such was the effect of the conveyances by Mrs. Goodloe to Sanders and by Sanders to Barry cannot, we believe, be intelligently disputed. The deeds upon their face disclose an outright purchase and sale for a money consideration, followed by grant of the fee in the land, without restriction or limitation, save a reservation of the vendor's lien to secure a portion of the unpaid purchase price. Thus all interest in the land of whatever nature passed to Barry, subject only to the prior easement of the railway for the purpose of constructing and operating its road over the strip designated by Mrs. Goodloe in her grant. Then it was that Barry, having acquired the absolute title to the 150 acres of land for town-site purposes, which included the right of way of the railway com-

pany across same, in compliance with his arrangement with the railway company to donate them a sufficient right of way through the proposed town, conveyed the strip already referred to. The consideration for the conveyance was that the railway company would locate and maintain upon the lands so conveyed its depot, and the estate granted was the fee therein. The granting clause of the deed is:

"Do by these presents grant, sell, and convey unto the St. Louis, Arkansas & Texas Railway Company * * * all that certain lot, piece, or parcel of land situated in said county of Navarro, at Frost, a station * * * upon said railway and on the Noah Kizziah survey of land, to wit [describing the enlarged right of way]."

Argument is not necessary to demonstrate the effect of such a grant. Thus by the several conveyances enumerated it is clear that from a perpetual right of way or easement upon the land the railway company succeeded to the fee or proprietary right therein, with the right to use the property for all lawful purposes, one of which was to lease a portion thereof for the purpose of a lumber yard, and subject to any rights that may have arisen from facts aliunde the deeds prior to the acquisition of the fee by the railway company which will be hereafter discussed.

[3-5] The next proposition urged under first and second assignments of error is that the court erred in peremptorily directing verdict for appellee because there was testimony adduced tending to show that the land in controversy was donated by Barry to the railway company for use for railway purposes only, and hence the issue should have been referred to the jury. Under the foregoing it is argued that the rule announced in Harrison v. Boring, 44 Tex. 257, applies. In that case it appears from the evidence that the Texas & Pacific Railway Company upon land which it owned laid out and platted the town of Longview, and through and by its agent appointed for that purpose sold town lots to various persons, to whom the agent represented that a certain lot or space within the limits of the proposed town had been reserved and permanently set apart for and upon which would be built its depot. Subsequently the lot so reserved was sold, and the purchasers were preparing to use it for private commercial purposes. Injunction was sought to prevent the proposed use of the depot lot, in connection with which it was further shown that the use of the depot for private business purposes would affect the use and utility of the other houses built upon faith of the representations that it would only be used for depot purposes. It was ruled under the facts related that a servitude was created upon the lot so reserved for the benefit of those who purchased lots in the proposed town in faith of the representations of the railway company which could not be destroyed by subjecting it to another and different use if, in fact, the representations were made. What similar

state of facts can be found in the record in the instant case which will authorize the application of the rule stated? Clearly the rule is not supported by the deed from Barry to the railway company, since that deed passed the fee of the lands to the railway company, by which, standing alone, the company could use the land for all lawful purposes, one of which is the renting and leasing of same for use in private business pursuits. Then, do the facts related in our statement, the platting of the land by Barry when he was owner of all of it, including the fee to the right of way, the distributing of maps, showing the arrangement of the town and the railway right of way in relation thereto, the fact that the company was actually operating its trains over the right of way before it acquired the right of way from Barry, and that Barry had sold as many as three lots under such conditions, create a servitude for the benefit of appellants upon the right of way by which its use must be restricted to the use contended for?

We forego any extended discussion of the law of easement or servitude; nor will we attempt to draw nice distinctions between the two. It is proper, however, to say in a general way that an easement is defined to be "a right which one proprietor has to some profit, benefit, or lawful use, out of or over the estate of another proprietor" (Henslee v. Boyd, 48 Tex. Civ. App. 494, 107 S. W. 128), and that a servitude is defined to be "the burden imposed on one tract of land for the benefit of another tract, to be enjoyed thereon as an advantage, liberty, or privilege to the owner of the latter tract" (Harrison v. Boring, 44 Tex. 255). Also in a general sense the rights conferred by easement or servitude may arise by deed or express grant, by prescription, by oral covenant, and by implication. See chapter on Easements, 14 Cyc. 1134. Accordingly, in view of the construction we have placed upon the deed from Barry to the railway company, and which is supported by the holding in Calcasieu Lumber Co. v. Harris, supra, and the absence of any claim of prescriptive use, any easement or servitude that appellants may have upon the right of way of the railway company obviously arises by implication, depending for its support upon the recited acts of Barry, and necessarily upon acts arising prior to the time the railway company acquired the fee to its right of way; for, of course Barry could not, after conveying the fee in the lands to the railway company, create any easement in or servitude upon the right of way, since unity of ownership is necessary to create such right in land. Do the facts recited then create an implied grant of easement or servitude upon the railway company's right of way? We conclude they do not. It was said in the case of Sellers v. H. & T. C. Ry. Co. et al., 81 Tex. 458, 17 S. W. 32, 13 L. R. A. 657:

"The questions of grant of easements by implication and of implied reservations of easements have given rise to much conflict of opinion. * * * *"

It is conceded to be the settled law in England:

"That, when the owner of two adjoining lots sells one, he does not reserve implied for the benefit of the other any easement except those of a strict necessity, * * * but that he does impliedly grant to the grantee all continuous and apparent easements which are necessary for the reasonable use of the property granted and which have been or are at the time of the grant used by the owner of the entirety for the benefit of the part granted. Washburn, Easements (4th Ed.) 105."

Under the facts in the instant case it cannot reasonably be said that, under Barry's arrangement of the proposed town of Frost as delineated upon his map, the same actually or upon the map raised any implication that the right of way would be used exclusively for railway purposes. Any such implication, as Justice Gaines said in the case just cited, must arise from some continuous or apparent easement "necessary for the reasonable use of the property granted and which have been or are at the time of the grant used by the owner of the entirety for the benefit of the part granted," or, as he says at another place, uses of "strict necessity." As we have said, the map of the town portrayed the right of way as a strip of land 300 feet wide and 3,200 feet long extending through the center of the town. Intervening between and parallelling the right of way and the blocks and lots of the town on each side for the full length thereof, and further on the north side, was a public street 60 feet wide, by which the public who might acquire lots in the town could reach intersecting streets and thereby cross the right of way. Clearly it seems to us this arrangement afforded all that was "necessary" and "reasonable" to the use of such town lots and was the only "apparent" easement to be implied therefrom. It must be borne in mind that no claim is, or perhaps could be, made by appellants of any right to go upon the right of way to transact any business conducted by those who have purchased lots in the town. The contention is that they may by reason of the claimed easement control the use to which the railway company may put the same. It must also be borne in mind that on the map of the town no words of express reservation as to the use to which the space so reserved would be put are written. It merely shows the space reserved, in the center of which are lines indicating railway tracks over which is written St. Louis, Arkansas & Texas Railroad. To say that an inspection of either the map or the ground itself would raise the implication of either an apparent or necessary easement or servitude upon the right of way for the use of possible purchasers of lots is not warranted by such facts alone. Accordingly we conclude that the evidence was

insufficient to require the submission of the issue to the jury.

What we have just said meets the issue presented by appellants under their third proposition under the first and second assignments of error.

What we have just said also meets the issues presented by appellants under their fourth proposition under the first and second assignments of error, to the effect that the building of said lumber sheds increased the fire hazard and obstructed their light and view, since such results are insufficient to prevent the construction and erection of a building in all respects lawful.

[6, 7] The third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, and fifteenth assignments of error challenge the action of the trial court in refusing to give as many special charges to the jury. Consideration of the assignments is objected to by the appellee because the refused charges are not presented in compliance with the recent amendments of the practice acts. For the reason that counsel for appellants frankly concedes the sufficiency of the objections we will not recite the particulars of the grounds upon which the objection is based. However, appellants ask us to consider the assignments presenting the action of the court in refusing the charges not as such, but as propositions of law under his first and second assignments of error. This may not, in our opinion, be done, since the effect would be: First, but to evade the amended practice acts; and, second, to present a proposition of law in a manner not authorized by the rules, and one not germane to the assignment of error under which it is sought to be presented. Accordingly the assignments will not be considered under the rule announced in St. Louis S. W. Ry. Co. v. Wadsack, 166 S. W. 42, and followed by this court in W. R. Case & Sons Cutlery Co. v. Folsom, 170 S. W. 1066; Texas Midland R. R. v. Fogleman, 172 S. W. 558; Horton v. Texas Midland R. R., 171 S. W. 1023, and cases cited.

[8] As will appear from our statement of the case, appellees recovered of appellants $562.50 damages resulting from the issuance of the temporary injunction. On this branch of the case, at conclusion of the evidence, appellants requested the court to give their special charge No. 31, the effect of which was to inform the jury that the damages sought could not be recovered, for the reason that the lease contract entered into between the appellee St. Louis Southwestern Railway Company of Texas and appellee Frost Lumber Company—

"creates and tends to create and carry out restrictions in trade and commerce, and aids to commerce, in the preparation of lumber for market, and in the transportation thereof, and that it also creates and carries out restrictions in the free pursuit of the transportation of lumber authorized by the laws of this state, and also prevents and lessens competition in the transportation of such lumber from the mills to the place of sale, and also prevents and lessens competition in aids to commerce and in the transportation of lumber upon the railways in this state."

The charge was refused, to which refusal appellees failed to except in the manner provided by law, and appellees in limine object to any consideration of the action of the court in refusing the charge for that reason. This assignment, as argued by appellants, in our opinion, presents fundamental error, if any at all, since the fact pointed out by the assignment itself, the claimed illegal contract, is enough "to make the error of law which pervades the case obviously apparent" without the necessity of further investigation in the record by the court, and for that reason is entitled to consideration. Texarkana & Ft. Smith Ry. Co. v. Brass, 175 S. W. 778.

[9] Furthermore, it seems to be the policy of the appellate courts to consider issues like the one here raised and those against public policy, whether presented in the trial or appellate courts. Pasteur Vaccine Co. v. Burkey, 22 Tex. Civ. App. 232, 54 S. W. 804, and cases cited. Hence we will consider the assignment.

[10] In support of the issue raised by the charge appellants present in their brief the twelfth clause of the lease contract between St. Louis Southwestern Railway Company of Texas and the Frost Lumber Company, which is, in part, as follows:

"Said party of the second part further agrees to, and shall, deliver, or cause to be delivered, to the railway company for transportation, all freight consigned to the party of the second part at said station which is transported to said point by rail, or may or can be transported to said points over the rails of the railway company: Provided, however, that the rates over said route are equal to those of its competitors; the purpose being that the railway company shall have the longest available haul of such freight over its own lines. Said party of the second part shall deliver to the railway company at said place all freight which it may have at any time to be transported or shipped from said place, and the railway company shall have the right to route all of said freight: Provided, the rate to destination is over the cheapest practicable route. Failure on the part of the second party to comply with these stipulations shall give the railway company the right, at its option, to terminate this agreement."

A careful consideration and analysis of that portion of the lease contract which is attacked as being illegal discloses that the Frost Lumber Company agreed: First to divert to the railway company's line all freight that could be transported to Frost over its line in order to give it the longest available haul on condition that its rates were equal to its competitors; and, second, to divert to it all freight originating from Frost on condition that it was routed over the cheapest practicable route. Article 7796, R. S. 1911, declares that:

"A 'trust' is a combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for either, any or all" of certain defined purposes.

The acts forbidden are numerous, but a careful examination of each specification convinces us that only the first and third subdivisions of the article may be said to have any application to the clause of the lease contract under consideration. Said subdivisions are as follows:

(1) "To create, or which may tend to create, or carry out restrictions in trade or commerce or aids to commerce or in the preparation of any product for market or transportation, or to create or carry out restrictions in the free pursuit of any business authorized or permitted by the laws of this state."

(3) "To prevent or lessen competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities, or the business of insurance, or to prevent or lessen competition in aids to commerce, or in the preparation of any product for market or transportation."

By the first subdivision it is made unlawful in the manner denounced by the statute, among other things, to restrict commerce or aids to commerce or transportation or the free pursuit of any business authorized or permitted by law. By the third subdivision it is made unlawful, among other things, to do any act which will lessen competition in transportation. The question then arises: As applied to the lease contract in question, does it in any manner restrict or lessen competition in the transportation of freight or the free pursuit of any business? The case of Ft. Worth & D. C. Ry. Co. v. State, 99 Tex. 34, 87 S. W. 341, 70 L. R. A. 950, involved a contract between a railway company and the Pullman Car Company by the terms of which the former company granted the latter company the exclusive right to furnish sleeping cars for the use of the railway company's passengers on condition that the Pullman Company should not charge or collect from its passengers for the use of berths and seats therein more than was collected by competing lines of railway for equal accommodations. The case was before the Supreme Court upon certified questions, one of which was:

"Is the contract in question, as set out in the findings of fact, executed between the railway company and the Pullman Company, in view of the facts as stated, in violation of any provision of the first section of the anti-trust statute of March 31, 1903, of the Session Laws of the Twenty-Eighth Legislature?"

In answering the question the Supreme Court said:

"Do the facts and the contract set out in the statement * * * show that the law has been violated by the corporations through any interference with transportation of passengers?"

In the instant case with freight. Proceeding, the court say:

"The only reference in the contract to any charges to be made by either company is the stipulation that the Pullman Company should not charge passengers in its cars on the line of the Ft. Worth & Denver City Railroad Company more than it charged on the lines of competing railroads. The contract did not require that the charges should be maintained as they were then fixed, nor did it fix any standard of charges by which either company should be governed. No pooling or combining of rates between the said companies was provided for, but each was at liberty to prescribe its own charges and to change them at its pleasure. * * * In fact, there was no semblance of a pooling or combination of rates; nor is there anything in the contract by which it would be possible to hold that the making, maintaining, or charging of rates by either company, or by any other company, corporation, or person, would be in the least affected. * * * It is manifest that the contract did not in any way affect or tend to affect transportation or charges therefor."

We think as much can be said concerning the contract under discussion. It does not fix the charges for transportation of freight or any standard therefor by which Frost Lumber Company or the railway company shall be governed. The railway company is free to make its own transportation charges so far as it can under the laws of this state, and the Frost Lumber Company is only bound to comply with its obligations under the contract when the rate fixed by the railway company or the rate-making authority of the state, is equal to the rate over the cheapest practicable route. The railway company is at liberty to increase its rate if it may, and is bound to do so if the rate-making authority directs it to do so. Hence it occurs to us that there is in no sense a combination of the capital, skill, or acts of the parties to the contract by which the unlawful act is or could be accomplished, so far as pertains to a restriction or lessening of charges for transportation is involved, and as a consequence does not tend to lessen or restrict competition in that respect. Then does the obligation of the Frost Lumber Company, when rates are equal and the route is practicable, to divert its freight exclusively to the railway company, "create or carry out restrictions in the free pursuit of a business authorized or permitted by the laws of this state"? In the case we have cited and quoted from it is said that the anti-trust statute does not "create a new business for any person, nor does it give a new right in the property of others." That declaration, applied to the facts in the instant case, clearly means that the act conferred upon the railway companies of the state no right to transport the freight of the Frost Lumber Company not possessed by them prior to the enactment of the law. Having so declared, the Supreme Court proceeds with the further declaration that:

"The object of the law was to prevent interference with business authorized and carried on in accordance with the laws of the state."

The court then asserts that, in order to determine whether there has been such "interference," it is pertinent to inquire:

"What business interest was in any way affected by this contract?"

The inquiry is equally pertinent in reference to the contract involved in this case. The Supreme Court, proceeding with its inquiry, declares that the inquiry by it propounded will find its answer in the answer to the further inquiry:

"Did all sleeping car companies have a right to demand of the railroad company to haul their coaches on its railroad? If yea, the contract restricted the free pursuit of a lawful business and constitutes a trust; * * * otherwise the law has not been violated by the agreement."

The court held that, since the sleeping car company could not demand of the railway that it haul its cars, there was no interference with any lawful business. A similar inquiry, it occurs to us, is pertinent here. Accordingly what right did the other competing railways of the state have to transport the freight of the Frost Lumber Company in or out of Frost which the contract has in any manner interfered with? As said by the Supreme Court, the act conferred no right on any person or corporation not possessed at the time the law was enacted. Hence we can conceive of no interest that the railways of the state possessed in the transportation of the freight of the Frost Lumber Company prior or subsequent to the law, other than that based and arising upon contract involving of course the mutual agreement of those affected. The shipper has always possessed the privilege of selecting the route or carrier over which he desires to transport his freight, and, according to the Supreme Court, the anti-trust act does not qualify that right, since it does not confer upon any person or corporation "a new right in the property of others," and to construe the contract under discussion to be within the provisions of the act would be to hold that the carriers of the state have a "property" right in the privilege of the shipper to make his choice of route or carrier in the transportation of his freight. When freight rates are made either by the carriers or the rate-making authorities, the shipper still has the choice of route and carrier, and may, if he desires, select the longest route or the poorest equipped carrier, and base the selection so made upon friendly relations with the carrier or upon any other ground that may appeal to him. By the terms of the contract under discussion no more can be said, it occurs to us, than that the Frost Lumber Company, in consideration of the railway company agreeing to permit the use of its right of way for a nominal sum, in turn agreed that, rates being equal, it would give the railway company preference. Agreeing to prefer a particular line of railway in matters of freight does not of itself "create or carry out restrictions in the free pursuit of a business authorized or permitted by the laws of this state," when unaccompanied by any act which actually does interfere with the pursuit of such business.

The "free pursuit" of the business of the carrier in the light of the contract in question is not that the Frost Lumber Company may not select its route, for that is the free pursuit of its business, but that the railway company shall not by contract require any shipper or agree with any shipper that it shall have the transportation of freight upon more favorable terms than shall its competing lines. There being no agreement that the Frost Lumber Company shall ship exclusively over the line of the appellee railway company, but, on the contrary, an express reservation that it may decline to do so, we are unable to see how the agreement can have the effect urged. Conceivably and probably appellee railway company may be unable to meet the rates of competing lines on both outbound and inbound freights. Therefore it cannot be said that the capital, skill, and acts of the contracting parties are so directed as to effect the unlawful purpose. In order to effect such purpose under the contract under discussion it must be construed to establish an agreement to exclusively ship freight over the line of appellee railway company. As we have said, such is not the effect of the contract we are discussing, since that is the identical thing which is expressly excluded, in that the lumber company has reserved the right to ship over competing lines when rates are not equal, or the route not practicable.

The remaining assignments of error challenge the sufficiency of the evidence to sustain the finding of the jury that the Frost Lumber Company owned the lumber alleged to be injured and damaged, as well as the sufficiency of the evidence to sustain the finding of the jury that the right of way had been, in fact, leased to the Frost Lumber Company. In respect to these matters we have reached the conclusion that the undenied pleading and the evidence are sufficient to sustain the finding in the respect complained of. We do not set out at length the pleading and the evidence which, in our opinion, support our conclusion, since to do so would subserve no purpose or be of benefit to counsel. Issues involving the sufficiency of the evidence to support a given issue cast upon this court the duty of examining the evidence. This we have done, and have reached the conclusion stated. To do more, as we have said, would be without purpose, and serve to lengthen an opinion already too extended.

Finding no reversible error in the judgment of the court below, it is affirmed.