## NOBLE ᴇᴛ ᴀʟ. *v.* OKLAHOMA CITY.*

No. 335.   Argued February 4, 5, 1936.—Decided March 2, 1936.

---

* Together with No. 336, *Higgins et al.* v. *Oklahoma City.*   Cer-
tiorari to the Supreme Court of Oklahoma.

*Messrs. Charles H. Garnett, Warren E. Libby,* and *Joe T. Rogers,* with whom *Messrs. Henry L. Goddard, Fred E. Suits,* and *Fred Ptak* were on the brief, for petitioners.

*Messrs. Harlan T. Deupree* and *W.. H. Brown* for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

These were actions in ejectment tried in a state court. The petitioners in No. 335 sued as the heirs of Naoma Noble, the petitioners in No. 336 as the heirs of Robert W. Higgins. Title to a town lot and a portion of another parcel of land located in the respondent city was in dispute.

The tracts formerly were part of the tribal lands of the Creek Indians. Pursuant to treaties the Creeks removed from east of the Mississippi River to a large area in Indian Territory, now in the State of Oklahoma,[1] and a patent was issued by the President of the United States, granting them the lands "to have and to hold . . . so long as they shall exist as a Nation and continue to occupy the Country hereby conveyed to them."[2] By the Treaty of Washington[3] the tribe ceded to the United States the western half of their domain, which included the site of what is now Oklahoma City, in trust, to be sold and used as homes for civilized Indians whom the United States might desire to settle thereon. This and a prior treaty vested in Congress power to grant railroad rights-of-way through the Creek country. The United

---

[1] 7 Stat. 366; 7 Stat. 417; 11 Stat. 699.

[2] Vol. 4 of Indian Deeds, in the Office of Indian Affairs, pp. 446–447.

[3] June 14, 1866, 14 Stat. 785.

States did not sell any portion of the ceded area to Indians or permit white settlement in the region of Oklahoma City and the land remained vacant.

By Act of February 18, 1888,[4] Congress authorized the Choctaw Coal and Railway Company to locate and construct a railroad traversing the southeastern portion of the Indian Territory, through lands of the Choctaw Nation whose title was similar to that of the Creek Nation.[5]

The President, on January 19, 1889, negotiated a treaty with the Creeks[6] by which they ceded to the United States full and complete title to the entire western half of their lands, thus freeing the area from the trust under which it had theretofore been held. This treaty was subject to ratification by the council of the Tribe and by Congress. It was confirmed by the former January 31, 1889.

Pending the ratification of the treaty, Congress, on February 13, 1889, amended the Act of February 18, 1888, to authorize the railway company to construct a branch extending from its main line northwestwardly through Choctaw and Creek country.[7] The road so authorized now traverses Oklahoma City. The Creek Tribe then owned the eastern portion of the Creek country through which the branch line was to run, and retained an interest in the western portion. March 1, 1889, Congress ratified the treaty of January 19, 1889, and, in the act of ratification, provided that "the lands acquired by the United States under said agreement shall be a part of the public domain."[8]

By Act of March 2, 1889,[9] Congress directed that the lands acquired from the Creek Nation should be disposed

---

[4] 25 Stat. 35.

[5] See Treaty of June 22, 1855, 11 Stat. 611.

[6] 25 Stat. 757.

[7] 25 Stat. 668.

[8] 25 Stat. 757.

[9] 25 Stat. 980, 1004–1005.

of to actual settlers under the homestead laws but that no person should be permitted to enter thereon until the territory was opened for settlement. The release, conveyance, and extinguishment of the Indians' rights was not to inure "to the benefit of or cause to vest in any railroad company any right, title, or interest whatever in or to any of said lands . . . and all grants or pretended grants of said lands or any interest or right therein now existing in or on behalf of any railroad company, except rights of way and depot grounds," were declared forfeited for breach of condition.

March 23, 1889, the President issued a proclamation opening a portion of the lands to settlement at noon April 22, 1889. Before the latter date the railway company had surveyed the line of its proposed railroad through what is now Oklahoma City and marked it by stakes along the centre line of the right-of-way and by signs warning that the land was claimed for right-of-way and station purposes. It appears to have been then known that a town site would be laid out on the quarter-section in which the Noble tract is located. Prior to the opening of the land a plat had been made and, at 12 o'clock, April 22, 1889, surveyors began to run lines and drive stakes to locate the lots and blocks of the town site. On that day many settlers, amongst whom was Naoma Noble, arrived and staked and occupied lots. As the survey proceeded they adjusted their claims and boundaries to the survey lines. In surveying and staking out lots both the surveyors and the ancestor of the petitioners in No. 335 disregarded the right-of-way marks. All the lots in the the original town site, comprising the quarter-section in which the Noble land is situated, were occupied on the day of opening. On the same day Robert C. Higgins, the ancestor through whom the petitioners in No. 336 claim, settled upon the quarter-section adjoining the

town site on the west, and undertook to file a homestead entry thereon.

July 13, 1889, the railway company filed with the Secretary of the Interior a map of definite location of its line as staked out through Oklahoma City. The road ran diagonally through the town site quarter-section, included the whole of the Noble lot, and traversed diagonally Higgins' adjoining quarter-section.

The Act of May 2, 1890,[10] organizing the Territory of Oklahoma, provided that "No part of the land embraced within the Territory hereby created shall inure to the use or benefit of any railroad corporation, except the rights of way and land for stations heretofore granted to certain railroad corporations. Nor shall any provisions of this act or any act of any officer of the United States, done or performed under the provisions of this act or otherwise, invest any corporation owning or operating any railroad in the Indian Territory, or Territory created by this act, with any land or right to any land in either of said Territories, and this act shall not apply to or affect any land which, upon any condition on becoming a part of the public domain, would inure to the benefit of, or become the property of, any railroad corporation." Not until May 14, 1890,[11] did Congress pass a town site act applicable to Oklahoma. In the meantime, the citizens had established a form of government and elected officials. A plan of the town site was filed in the office of the City Recorder and provision made by ordinance for recording transfers of the plotted property. The Recorder issued certificates to the occupants of lots and transfers were made by quit-claim deeds. After the passage of the town site act trustees were appointed and the entire quarter-section constituting the original town site was patented to the trustees.

[10] 26 Stat. 81, 91.
[11] 26 Stat. 109.

without exception, limitation, or reservation. In due time the trustees issued their deeds for the various lots, including the Noble tract.

From 1889 to 1893 the railway company and the lot claimants were in disagreement, the former contending that the acts of Congress vested it with title to the right-of-way, the latter insisting that their occupation before the filing of the company's plot with the Secretary of the Interior gave them the superior title. The dispute was amicably settled by the company's relinquishing its claim to the diagonal three hundred foot right-of-way as plotted, and relocating it, one hundred feet wide, parallel to the streets and alleys shown on the city plan. The lots or portions of lots required for the relocation were obtained from the owners by deeds or condemnation. March 28, 1891 Naoma and George Noble executed a deed to the railway company containing the following clause:

"Being intended for the use and occupation of said party [grantee], its successors and assigns, as and for its right-of-way for the constructing, operation and maintenance of its railroad and business at or upon the land hereby released and quit claimed: Provided, that in case of abandonment of said premises by said second party, its successors or assigns for the purposes above mentioned, the same shall revert to the grantors, their heirs or assigns."

The right of Higgins to make a homestead entry being involved in a land office contest, the company constructed its road across his quarter-section and was operating trains thereover in 1892. After the contest eventuated in his favor he conveyed to the railroad, in 1898, for a pecuniary consideration, a strip of land one hundred feet wide across his quarter-section "for a right of way for its railroad, Telegraph and Telephone Lines, and for Railroad or Station purposes." The habendum clause was:

"To have and to hold the same by the said Choctaw Oklahoma and Gulf Railroad Company, together with all and singular the rights, privileges and appurtenances thereunto belonging and all the rights and privileges which said company is authorized to have, hold and exercise under and by virtue of the Act of Congress granting the Choctaw Coal and Railway Company a right of way through the Indian Territory, approved February 18th, 1888, and subsequent Acts of Congress amending and extending said Act together with all the rights and privileges granted unto said Choctaw, Oklahoma and Gulf Railroad Company by an Act of Congress approved August 24th, 1894, and the Act of Congress approved April 24th, 1896, and unto its successors, and assigns forever."

The road constructed on the right-of-way so acquired in Oklahoma City was operated by the railway and its successors until December 4, 1930. Pursuant to an agreement made with the city, the then owner and operator secured the approval of the Interstate Commerce Commission of the abandonment of the line,[12] and executed a quit-claim deed to the city for the abandoned portion. A decree was obtained from the United States District Court for the Western District of Oklahoma adjudging that the land had been abandoned for railroad purposes and that the company's title had passed to the city under an Act of Congress of March 8, 1922.[13] None

[12] The railway was reorganized as Choctaw, Oklahoma and Gulf Railroad Company and the reorganized company given the same rights as its predecessor. 28 Stat. 502; 29 Stat. 98. At the time of the abandonment the Chicago, Rock Island and Pacific Railroad Company was operating the line in question under a lease for 999 years.

[13] 42 Stat. 414, 43 U. S. C., § 912: "Whenever public lands of the United States have been or may be granted to any railroad company for use as a right of way for its railroad or as sites for railroad structures of any kind, and use and occupancy of said lands for such purposes has ceased or shall hereafter cease, whether by forfeiture or by

of the petitioners was a party to this proceeding. The city took possession and has since held the strip. These suits were filed shortly thereafter. Petitioners asserted that the Act of February 18, 1888, and the amending Act of February 13, 1889, made no grant *in praesenti* of a right-of-way but merely authorized the company to acquire one by purchase or condemnation; that these statutes applied only to Indian country and not to the public domain; and that on February 13, 1889, the land in question was Creek Indian land and the only title the company acquired to its right-of-way, so far as the tracts in controversy are concerned, was that conveyed by the deeds of petitioners' ancestors under both of which the title, on abandonment for railroad purposes, reverted to their heirs and assigns. The defense to this claim was that the acts presently invested the railway with title to the right-of-way subsequently located, obtained and used, which, upon abandonment of the use, reverted to the United States and was, by the Act of March 8, 1922, conveyed to the respondent.

Petitioners further urged that, even if the acts of Congress operated as grants *in praesenti,* the estate of the

abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress, then and thereupon all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures of any kind as aforesaid, except lands within a municipality the title to which, upon forfeiture or abandonment, as herein provided, shall vest in such municipality, and this by virtue of the patent thereto and without the necessity of any other or further conveyance or assurance of any kind or nature whatsoever: . . ."

company endured only so long as the land was devoted to railroad use, with a right of reverter; either vested in the Creek Tribe and conveyed to the United States by the cession effective March 1, 1889, or vested directly in the United States; and the right of reverter passed from the United States by patent to the petitioners' ancestors and from them, by deed and inheritance, to the respective petitioners. Upon the extinguishment of the railroad's estate by abandonment, full title, so they claimed, reverted to them. They alleged the Act of March 8, 1922, does not apply in the circumstances and, if held applicable, is unconstitutional as depriving them of property without due process.

The trial court entered judgments in favor of the city and, on appeal, the Supreme Court of Oklahoma consolidated the cases for hearing and affirmed the judgments.[14] In their applications for certiorari the petitioners asserted that the state court's construction of the Acts of 1888 and 1889 conflicts with the decision of a federal court in respect of an act identical in terms,[15] and stressed the importance of a final adjudication as affecting not only their titles but many others in Oklahoma City, the subject of threatened suits in state and federal courts. On this showing the writ was granted.

*First.* The Act of February 18, 1888, does not purport to grant lands for right-of-way and station purposes. The title is "An act to authorize the Choctaw Coal and Railway Company to construct and operate a railway through the Indian Territory." By the first section the company is "invested and empowered with the right of locating, constructing, owning, equipping, operating, using, and maintaining a railway." Section 2 provides that the corporation "is authorized to take and use" for railway, but

---

[14] 172 Okla. 182; 44 P. (2d) 135.

[15] *United States* v. *Fort Smith & Western R. Co.*, 195 Fed. 211, 214.

for no other purpose, a right-of-way and "to take and use" land for station purposes. Section 3 requires that, before the road shall be constructed through land held by any individual occupant according to Indian usage, full compensation must be made to the occupant, prescribes the method of securing compensation, and creates a tribunal for ascertaining and awarding it, from whose decision a right of appeal to a federal court is given. Section 5 lays on the company the obligation to pay to any tribe through whose unallotted lands the line may run a fixed compensation per mile. If the tribe be dissatisfied with the amount specified in the act the just measure of compensation is to be ascertained by the same procedure as is directed in the case of an individual allottee. The company is permitted to survey and locate its railway immediately; and, by § 6, is required to cause maps, showing the location of its lines, to be filed with the Secretary of the Interior and with the chiefs of the nations or tribes, through whose lands they run. The section adds: "After the filing of said maps no claim for a subsequent settlement and improvement upon the right of way shown by said maps shall be valid as against said company." The Secretary of the Interior is to approve of the location before any construction may be begun. Section 13 enacts: "The right of way herein and hereby granted shall not be assigned or transferred in any form whatever prior to the construction and completion of the road, . . ." Except for the words just quoted from § 13 upon which respondent relies the act plainly grants an authority or a franchise rather than physical property. The expression used in that section is not sufficient to enlarge the limited scope of the act disclosed by the enacting sections.

The respondent, and the court below, refer to decisions holding certain right-of-way acts to be grants *in praesenti*, but those acts not only affect the public lands of the United States which are subject to unrestricted disposition

by the Government,[16] but explicitly state that "a right of way is hereby granted." [17]

The Act of 1888, considered in its entirety, evinces the intent that the company is to compensate for all lands taken for its use, whether those of individual allottees or of the tribe. No provision for compensation to white settlers was made because at the date of the passage of the statutes none were permitted within the area to be traversed by the railroad. The acts in question were construed by Assistant Attorney General (now Mr. Justice) Van Devanter in an opinion rendered to the Department of the Interior in 1898,[18] as not making grants *in praesenti*, but conferring only the right to locate a railroad and take the necessary land upon making just compensation to its owners or those having an inchoate right of ownership. A similar conclusion was announced by the Circuit Court of Appeals for the Eighth Circuit [19] in respect of the act authorizing the building of the Fort Smith and Western Railroad,[20] which is identical with that under review except for the name of the company and the termini of the projected railroad.

Later statutes respecting the railroad are said to support respondent's view of the nature of the original grant. We think, however, the subsequent legislation is, at best, of doubtful aid in the construction of the Act of 1888. The Act of February 13, 1889, amended § 1 of the orig-

[16] *Ruddy* v. *Rossi,* 248 U. S. 104, 106.

[17] See, e. g., *Missouri, K. & T. Ry. Co.* v. *Kansas Pacific Ry. Co.,* 97 U. S. 491; *Railroad Co.* v. *Baldwin,* 103 U. S. 426; *United States* v. *Southern Pacific R. Co.,* 146 U. S. 570; *Northern Pacific Ry. Co.* v. *Townsend,* 190 U. S. 267; *United States* v. *Michigan,* 190 U. S. 379. The general railroad act of 1875 (18 Stat. 482) also grants a right-of-way *in praesenti: Jamestown & Northern R. Co.* v. *Jones,* 177 U. S. 125; *Stalker* v. *Oregon S. L. R. Co.,* 225 U. S. 142.

[18] 27 Land Office Decisions, 414.

[19] *United States* v. *Ft. Smith & Western R. Co.,* 195 Fed. 211, 214.

[20] 30 Stat. 1368.

inal act by authorizing the construction of the branch line extending westwardly and northwestwardly from the main line, which branch now runs through the respondent city. It made no other alteration in the provisions of the earlier legislation. The Acts of February 21, 1891,[21] and January 22, 1894,[22] extended the time originally granted for constructing the railroad. The latter act added: "And for such purpose the said company shall have the right to take and occupy the right of way and depot grounds heretofore granted to it by said acts." We think, in the light of the clear provisions of the original authorization, no inference favorable to the respondent's contention is to be drawn from this phrase in the extending act.

On the other hand, Congress has indicated its view that the original act merely authorized the exercise of the right of eminent domain. By the Act of August 24, 1894,[23] the creditors and stockholders of the railway, which had become insolvent, were reorganized into a new corporation, the Choctaw, Oklahoma and Gulf Railroad Company. Section 4 provides: "That it shall and may be lawful for such new corporation to construct and operate branches from its said railroad and for such purpose to take and use rights of way ... upon making compensation therefor as provided in the case of taking land for its main line ..."

Respondent also cites a portion of § 18 of the Organic Act for the Territory of Oklahoma quoted *supra* to support the claim that by the Act of 1888 Congress intended to grant *in praesenti*. For the same purpose the court below quoted and relied on one sentence found in the section. We think, however, that the provision was

---

[21] 26 Stat. 765.

[22] 28 Stat. 27.

[23] 28 Stat. 502. And see § 2 of the Act of April 24, 1896, 29 Stat. 98; § 2 of the Act of March 28, 1900, 31 Stat. 52.

merely intended to preserve the *status quo* and does not aid in the construction of previous legislation respecting the rights of railroads in the Territory.

Were the Act of 1888 of doubtful import the conditions existing when it and the amending act of 1889 were adopted would be conclusive of the legislative intent. The main line authorized by the first act ran for the greater portion through the lands of the Choctaw and Chickasaw Indians. The title of these tribes was substantially similar to that of the Creeks; and while, in the treaty by which their title was confirmed, there was provision that rights of way for railroads might be granted through their territory, the condition was added that full compensation should be made for any property taken or destroyed in the construction of any such road. The branch line authorized by the Act of 1889 extended westward through the eastern portion of the Creek lands which was unaffected by the treaty of 1866. The treaty of 1856 with this tribe contained a provision similar to that found in the Choctaw Treaty securing compensation for lands taken for railroad rights of way. The branch line also was to traverse the western portion of the Creek Nation's territory but, at the time the branch was authorized (February 13, 1889), that area was not public land of the United States and was held in trust for the settlement of other Indians. The restriction was not removed until March 1, 1889, at which time these lands were declared to be part of the public domain and intended for white settlement.

Both the original and the amending act contemplated that the right-of-way would run through lands owned by Indian tribes or claimed by Indian allottees and none other. In view of the nature of the title of the Indians, we cannot impute to the Congress a purpose by the Act of 1888 to grant any portion of the lands to the company or to impose a servitude without compensation.

For these reasons we are unable to agree with the construction of the act by the Supreme Court of Oklahoma in the present case and in earlier decisions.[24] We hold the legislation granted a franchise, authorized a taking upon compensation secured or made, and was not a grant of land.

*Second.* Assuming, for the sake of argument, that the Act of 1888 granted the railroad a base or limited fee, as does the general railroad act of March 3, 1875,[25] we think the marked similarity of this special act to the general statute requires that they be given the same construction. It is well settled that the title to right-of-way and station lands conferred by the general railroad act does not accrue to the company until a map of definite location is filed with the Secretary of the Interior for his approval, or the road is actually constructed, and the rights of one claiming by settlement or occupancy antedating such filing or construction, are superior to those of the railroad.[26] Like the general railroad law, the act in question required the filing of plats of the location of the line for the Secretary's approval and, in addition, expressly subordinated to the railroad's rights any claim based on a settlement subsequent to such filing. This was a clear recognition of the principle applied to rights-of-way acquired pursuant to the general law, which was that the staking of a location of the proposed line was ineffectual to prevent the acquirement of rights by settlers and occupants under the homestead and town site laws.[27] It is not to be supposed that a different rule was

---

[24] *United States* v. *Choctaw O. & G. R. Co.*, 3 Okla. 404, 41 Pac. 729; *Churchill* v. *Choctaw Ry. Co.*, 4 Okla. 462, 46 Pac. 503.

[25] C. 152, 18 Stat. 482; 43 U. S. C., §§ 934–939. See *Rio Grande Western Ry. Co.* v. *Stringham*, 239 U. S. 44, 47, and cases cited.

[26] *Minneapolis, St. P. & S. S. M. Ry. Co.* v. *Doughty*, 208 U. S. 251; *Great Northern Ry. Co.* v. *Steinke*, 261 U. S. 119.

[27] *Ibid.*

intended by the Act of 1888. The petitioners entered upon their tracts April 22, 1889. The company's map was not filed with the Secretary of the Interior until July 13th of the same year. Whatever the quality of the statutory grant to the railroad company, its rights had their inception after the assertion of, and were inferior to, those of the petitioners' ancestors.

*Third.* It follows from what has been said that the railroad derived title to the Noble lot by the deed of Naoma and George Noble of March 28, 1891. As no question is made but that the reverter clause in that deed became operative upon abandonment of the line, the Noble title is superior to that of the respondent. It is equally true that when Higgins made his deed to the railroad company in 1898 he had good title to the premises conveyed and by that conveyance the railroad obtained whatever estate it had. The petitioners insist that the habendum clause in the deed operated to clothe them with full title on abandonment of the right of way. They say that the Supreme Court of Oklahoma so held. The opinion seems to proceed on this assumption, but in the view the court took, a decision of the question was unnecessary, and we find no direct ruling upon the point. We express no opinion as to the effect of the habendum clause, since this is a question of state law and appropriately may be decided by the state court.

The grounds stated for our decision make it unnecessary to consider or to decide the other questions raised by the petitioners. The judgment of the Supreme Court of Oklahoma must be reversed and the causes remanded to that Court for further proceedings not inconsistent with this opinion,

*Reversed.*