## MACDONALD v. UNITED STATES.

## GREAT NORTHERN RY. CO. v. SAME.

### No. 9624.

Circuit Court of Appeals, Ninth Circuit.

May 8, 1941.

WILBUR, Circuit Judge, dissenting.

———◆———

W. H. Hoover, J. E. Corette, Jr., and L. V. Ketter, all of Butte, Mont., for appellant MacDonald.

F. G. Dorety, Gen. Counsel, of St. Paul, Minn., and T. B. Weir, of Helena, Mont., for appellant Great Northern Ry. Co.

Norman M. Littell, Asst. U. S. Atty. Gen., John B. Tansil, U. S. Atty., of Butte, Mont., and Vernon L. Wilkinson, Atty., Department of Justice, of Washington, D. C., for appellee the United States.

Before WILBUR, GARRECHT, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The United States prevailed below in a suit to enjoin the Great Northern Railway Company from drilling for or removing oil, gas and minerals underlying its right of way, except pursuant to the provisions of the act of May 21, 1930, 46 Stat. 373, 30 U.S.C.A. § 301 et seq., which authorizes leases for such purpose.

The Great Northern extends westerly from Minnesota to Puget Sound. It has numerous branch lines. In 1891 its predecessor, the Saint Paul, Minneapolis & Manitoba Railroad Company, pursuant to the General Right of Way Act of March 3, 1875, 18 Stat. 482, 43 U.S.C.A. § 934 et

seq.,[1] filed with the Department of the Interior a map of definite location of that portion of its road passing through Glacier County, Montana.[1a] In 1907 that company conveyed all its rights of property to the Great Northern. With the discovery of oil in Glacier County on lands adjacent to the right of way, the nature of the estate in the land granted by Congress for right of way purposes has become a question of considerable importance. The complaint and answer in the suit were so drafted as to present the question whether the railroad owns the underlying minerals, or whether by the terms of the 1875 act subsurface rights were reserved to the United

[1] "Chap. 152.—An act granting to railroads the right of way through the public lands of the United States.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station-buildings, depots, machine shops, side-tracks, turnouts, and water-stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

"Sec. 2. That any railroad company whose right of way, or whose track or road-bed upon such right of way, passes through any canyon, pass, or defile, shall not prevent any other railroad company from the use and occupancy of the said canyon, pass, or defile, for the purposes of its road, in common with the road first located, or the crossing of other railroads at grade. And the location of such right of way through any canyon, pass, or defile shall not cause the disuse of any wagon or other public highway now located therein, nor prevent the location through the same of any such wagon road or highway where such road or highway may be necessary for the public accommodation; and where any change in the location of such wagon road is necessary to permit the passage of such railroad through any canyon, pass, or defile, said railroad company shall before entering upon the ground occupied by such wagon road, cause the same to be reconstructed at its own expense in the most favorable location, and in as perfect a manner as the original road: Provided, That such expenses shall be equitably divided between any number of railroad companies occupying and using the same canyon, pass, or defile.

"Sec. 3. That the legislature of the proper Territory may provide for the manner in which private lands and possessory claims on the public lands of the United States may be condemned; and where such provision shall not have been made, such condemnation may be made in accordance with section three of the act entitled 'An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the Government the use of the same for postal, military, and other purposes, approved July first, eighteen hundred and sixty-two,' approved July second, eighteen hundred and sixty-four.

"Sec. 4. That any railroad-company desiring to secure the benefits of this act, shall, within twelve months after the location of any section of twenty miles of its road, if the same be upon surveyed lands, and, if upon unsurveyed lands, within twelve months after the survey thereof by the United States, file with the register of the land office for the district where such land is located a profile of its road; and upon approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office; and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way: Provided, That if any section of said road shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any such uncompleted section of said road.

"Sec. 5. That this act shall not apply to any lands within the limits of any military, park, or Indian reservation, or other lands specially reserved from sale, unless such right of way shall be provided for by treaty-stipulation or by act of Congress theretofore passed.

"Sec. 6. That Congress hereby reserves the right at any time to alter, amend, or repeal this act, or any part thereof.

"Approved, March 3, 1875."

[1a] We are not advised of the date of filings relating to other portions of the right of way.

States. The court granted the government's motion for judgment on the pleadings, thus resolving the dispute in favor of the United States.

Appellant MacDonald sought leave to intervene in the trial court, and from the denial of his petition he appeals. His grievance will be considered later in the opinion.

Counsel have gathered in the briefs a wealth of material bearing on the subject of the nature of a railroad's interest in its right of way. It is not our purpose, however, to give more than passing notice to the authorities cited; the search need not take us so far afield. Enough to say that as a general rule a railroad company is recognized as having something of greater dignity than the easement known at common law. Its right to the exclusive occupancy of the surface, and so much of the subsurface as is essential for railroad purposes, has been said to be as absolute as that of an owner in fee, subject only to the possibility of loss or termination of the right by reason of non-user. Most of the modern decisions in the states go no farther than to recognize an exclusive easement or a qualified fee in the surface. For good statements of the view see Pennsylvania S. Valley R. Co, v. Reading Paper Mills, 149 Pa. 18, 24 A. 205; Kansas C. R. Co. v. Allen, 22 Kan. 285, 31 Am.Rep. 190; Smith v. Hall, 103 Iowa 95, 72 N.W. 427, 428. On the other hand, counsel for the Great Northern call attention to many state statutes or special acts, antedating 1875, permitting railroad companies to acquire a fee simple estate in their rights of way. It is claimed that the majority of the not very numerous state decisions upon this question, prior to 1875, upheld the view that a railroad has the fee in the land over which its right of way passes.[2] We assume this to be true.

So much for the general law on the subject. It is obvious that much depends upon the facts of each case, the terms of the governing statute or the wording of the particular grant or conveyance. Cf. Carter Oil Co. v. Welker, 7 Cir., 112 F.2d 299.

■ It is the contention of the Great Northern that the estate conveyed by the various federal grants is a fee simple ownership in the land itself, subject only to the condition subsequent that it be used for railroad purposes. For this proposition it relies confidently on decisions of the Supreme Court in which the estate or interest acquired is described as a limited fee. Thus in Northern Pacific Ry. Co. v. Townsend, 190 U.S. 267, 23 S.Ct. 671, 672, 47 L.Ed. 1044, the court said of the right of way granted to the Northern Pacific under the act of July 2, 1864, 13 Stat. 365, that "in effect the grant was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." Similar language is found in other opinions of the court.[3] It would serve no useful purpose to undertake here a statement of the facts of these cases or of the way in which the question of title arose; enough to say that in none of them was the court confronted with the question of the ownership of underlying minerals. We do not believe the holdings are decisive of that question. So far, however, as concerns the surface area embraced in the federal right of way grants, it may be taken as settled that the title of the railroads is the equivalent of a fee, limited only by the possibility of reverter. One of this group of cases, Rio Grande Western R. Co. v. Stringham, 239 U.S. 44, 36 S.Ct. 5, 60 L. Ed. 136, directly involves the 1875 act, and special consideration will be given it later in the opinion.

---

[2] For authorities dealing with the general subject see footnote to Magnolia Petroleum Co. v. Thompson, 8 Cir., 106 F. 2d 217, 227.

[3] Missouri K. & T. R. Co. v. Roberts, 152 U.S. 114, 14 S.Ct. 496, 38 L.Ed. 377; Missouri K. & T. R. Co. v. Oklahoma, 271 U.S. 303, 46 S.Ct. 517, 70 L.Ed. 957; Noble v. Oklahoma City, 297 U.S. 481, 494, 56 S.Ct. 562, 80 L.Ed. 816; Clairmont v. United States, 225 U.S. 551, 556, 32 S.Ct. 787, 56 L.Ed. 1201; Buttz v. Northern Pacific R. Co., 119 U.S. 55, 66, 7 S.Ct. 100, 30 L.Ed. 330; Choctaw O. & G. R. Co. v. Mackey, 256 U.S. 531, 538, 41 S.Ct. 582, 65 L.Ed. 1076; Noble v. Union River Logging R. Co., 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123; United States v. Michigan, 190 U.S. 379, 23 S.Ct. 742, 47 L.Ed. 1103; Northern Pacific R. Co. v. Ely, 197 U.S. 1, 25 S. Ct. 302, 49 L.Ed. 639; Stalker v. Oregon Short Line R. Co., 225 U.S. 142, 32 S.Ct. 636, 56 L.Ed. 1027; Great Northern R. Co. v. Steinke, 261 U.S. 119, 43 S. Ct. 316, 67 L.Ed. 564. Compare Railway Co. v. Alling, 1878, 99 U.S. 463, 475, 25 L.Ed. 438; Smith v. Townsend, 1893, 148 U.S. 490, 498, 499, 13 S.Ct. 634, 37 L.Ed. 533.

The grants prior to 1871 included extensive acreages in addition to the right of way. The largest, the donation to the Northern Pacific, embraced the 20 alternate odd-numbered sections of public lands on each side of the road, or a total of about 40,000,000 acres. It is a matter of history that this lavish policy had met with public disfavor prior to the adoption of the General Right of Way Act of 1875.[4] The change in public sentiment is reflected in a resolution passed by the lower house of Congress March 11, 1872. The resolution declares that in the judgment of the house, "the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued, and that every consideration of public policy and equal justice to the whole people requires that public lands should be held for the purpose of securing homesteads to actual settlers, and for educational purposes, as may be provided by law."[5] At the time of the passage of the General Right of Way Act the title to the great bulk of the lands in the western states and territories was in the United States, and if railroad construction was to continue at all it was essential to grant a right of way over the public domain for this purpose. The 1875 grant was not in the nature of a bounty; rather it was legislation calculated to promote settlement and to enhance the value of the public domain made accessible by the building of railways. United States v. Denver & Rio Grande Ry. Co., 150 U.S. 1, 14 S.Ct. 11, 37 L.Ed. 975. At the outset, it is not lightly to be assumed that Congress intended to grant rights more extensive than those necessary to enable the roads to build over the public land.

We turn now to the provisions of the act. It opens with the statement that "the right of way through the public lands of the United States is hereby granted to any railroad company * * * to the extent of one hundred feet on each side of the central line of said road * * *." Section 4 provides for filing with the local register of a profile of the road, and for the notation of the same upon the plats in his office after approval by the Secretary of the Interior. It was early held by the Secretary that the 4th section provides a method of securing the benefits of the act in advance of construction; and that in those instances where the road had actually been built over the public land it was unnecessary to file a map of definite location. Dakota C. R. Co. v. Downey, 8 Land Dec. 115. This administrative holding was followed by the court in Jamestown & Northern R. Co. v. Jones, 177 U.S. 125, 20 S.Ct. 568, 4 L.Ed. 698, and was later applied in Stalker v. Oregon S. L. R. Co., 225 U.S. 142, 32 S. Ct. 636, 56 L.Ed. 1027.

The 4th section, after authorizing the procedure above mentioned, significantly provides that "thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way." A provision somewhat similar appears in the grant to the Portland, Dalles and Salt Lake Railroad Company, 17 Stat. 52, approved April 12, 1872; but no provision of the kind is found in any of the earlier acts. Elaborate attempts are made to explain away this language, as, for example, by saying that it is a mere statement of the obvious; but the clause ought to be taken as meaning what it says. If by force of the filing and approval of the profile Congress intended that the fee simple title should vest in the railroad, surely language so utterly incompatible would not have been employed in the direction for future disposition immediately following. Apter words to indicate the intent to convey an easement would be difficult to find. We need not labor the point. The act is to be read as a whole and effect given, if possible, to all its provisions. While in respect of its affording a special means of claiming the benefits of the act section 4 may be said to have a special purpose, there is no persuasive reason for believing that the clause in question does not qualify as well as illuminate the entire statute.

The grantee is entitled to have the act liberally construed to effect the purpose for which it was enacted. United States v. Denver & Rio Grande Railway Co., supra. Otherwise it is to be construed strictly in conformity with the rule that grants from the sovereign should receive a construction favorable to the claim of the government rather than that of the grantee. "Nothing passes by implication, and unless the language of the grant be clear and explicit as to the property conveyed,

---

[4] See "Land Grants" 9 Encyclopaedia of the Social Sciences (1933), page 35; "Land Grants to Railways", 3 Dict.Am. Hist. p. 237 (1940).

[5] Cong. Globe, 42nd Congress, 2nd sess. 1585 (1872). Cf. also H.Rept. No. 10, 43rd Cong., 2nd sess. (1874), p. 1.

that construction will be adopted which favors the sovereign rather than the grantee." Northern Pacific Railway Co. v. Soderberg, 188 U.S. 526, 23 S.Ct. 365, 368, 47 L.Ed. 575. And see Caldwell v. United States, 250 U.S. 14, 20, 21, 39 S.Ct. 397, 63 L.Ed. 816. A grant of the underlying minerals would have been an obvious subsidy and it was plainly not the purpose of Congress to subsidize the roads.[6]

As noted in Northern Pacific Ry. Co. v. Soderberg, supra, in the grants subsequent to 1860, embracing lands in the then unsurveyed and little known territories, a reservation was invariably made of lands suspected of being rich in metals. The Northern Pacific grant, for example, excluded mineral lands, although at the same time it excluded coal and iron from the definition of minerals. True, the reservation contained in these grants was of the land itself, not of the underlying minerals; and necessarily the right of way grants were intended to be effective whether or not the way selected should extend over mineral lands. But for this very reason the settled policy adds color to the belief that the general act of 1875 was intended as granting no more than a right of passage.

This view of the act is in line with the interpretation almost uniformly given it by the Department of the Interior. The right of way circular issued January 13, 1888 (12 Land Dec. 423) states that "the act of March 3, 1875, is not in the nature of a grant of lands; it does not convey an estate in fee, either in the 'right of way' or the grounds selected for depot purposes.[7] It is a right of use only, the title still remaining in the United States. * * * All persons settling on public lands to which a railroad right of way has attached, take the same subject to such right of way and must pay for the full area of the subdivision entered, there being no authority to make deductions in such cases." The verbiage is repeated in the regulations of March 21, 1892, 14 Land Dec. 338. The phraseology of the revision of November 4, 1898, (27 Land Dec. 663, 664) is slightly different, but the grant is said to be merely of a right of use for necessary railroad purposes, the fee remaining in the United States. Perhaps out of deference to the language of the Supreme Court in Northern Pacific Ry. Co. v. Townsend, supra, the grant is described in the revision of February 11, 1904, 32 Land Dec. 481, 482, 483, as "a base or qualified fee giving the possession and right of use of the land for the purposes contemplated by law." But in the regulations of May 21, 1909 (37 Land Dec. 787, 788), the notion disappears that the estate granted is a base or qualified fee, and the original thought is resumed that the railroad takes an easement only, the fee simple title remaining in the United States.[8] As was to be expected, the rulings of the Department subsequent to 1915 become confused and uncertain.

We turn now to the decision in Rio Grande Western Ry. Co. v. Stringham, supra. The opinion was handed down in 1915. The dispute concerned a strip of land claimed by the railroad company as a right of way under the act of March 3, 1875. The defendants asserted title under a patent for a placer mining claim. On appeal to the Utah supreme court a judgment in favor of the defendants was reversed and the case remanded with a direction to "enter a judgment awarding to the plaintiff title to a right of way over the lands in question 100 feet wide on each side of the center of the track." 38 Utah 113, 110 P. 868, 872. The trial court entered judgment accordingly. The railroad company again appealed, insisting that the judgment was inadequate, and that it had a fee simple title. 39 Utah 236, 115 P. 967. The court said that appellant's grievance should have been asserted by petition for a rehearing and declined to modify the judgment. On appeal to the Supreme Court of the United States the judgment was affirmed. In the course of its affirming opinion the latter court said: "The right of way granted by this and similar acts is neither a mere easement, nor a fee simple absolute, but a limited fee, made on an implied condition of reverter in the event that the company ceases to use or retain the

---

[6] The right given by the act to take from the adjacent public lands material and timber necessary for construction has been held not to authorize the taking of timber for use in the building of rolling stock for operating purposes. United States v. Denver & R. G. Ry. Co., supra.

[7] The present case does not involve the land granted for station and kindred purposes; and concerning that phase of the act we express no opinion.

[8] See also, as further illustrative of the administrative interpretation, 1903, 32 Land Dec. 33; 1907, 35 Land Dec. 495; 1899, 28 Land Dec. 412.

land for the purposes for which it is granted, and carries with it the incidents and remedies usually attending the fee." [239 U.S. 44, 36 S.Ct. 6, 60 L.Ed. 136.]

On its facts the case is distinguishable. If subsurface rights had been in issue, the decision would compel us to reverse the present judgment; but subsurface rights were not involved, and the judgment of the Utah court was properly affirmed as it stood. The government was not represented in the suit and we are informed that the defendants themselves filed no brief. Not having its attention called to significant differences between this and earlier grants with which it had dealt, the court merely paraphrased the language of former opinions. Now we are asked to accept the dicta as gospel, despite its manifold shortcomings even as dicta. We choose to believe the statute is a safer guide.

■ The act of May 21, 1930, 46 Stat. 373, 30 U.S.C.A. § 301, provides that the Secretary of the Interior may, if he deems it in the public interest, "lease deposits of oil and gas in or under lands embraced in railroad or other rights of way acquired under any law of the United States, whether the same be a base fee or mere easement." This statute is little more than a self-serving declaration, as it was enacted at a time when the ownership of the underlying oil had become a subject of controversy. However, an earlier act of June 26, 1906, 34 Stat. 482, 43 U.S.C.A. § 940, is of some value in the interpretation of the 1875 grant. That act, which declared a forfeiture of unused rights of way, refers to the grant as an easement.

■ The petition of appellant MacDonald for leave to intervene alleged that a certain quarter section of land, described in the government's complaint as being part of the land crossed by the Great Northern's right of way, had been the subject of a homestead patent to his predecessor containing no exception of the oil or other minerals under it. The whole area within the exterior boundaries of the quarter section had, petitioner averred, been included in the patent, subject to the railroad's right of way. It was alleged that both the government and the railroad company claim title to the minerals underlying the right of way as it crosses this quarter section, but that the ownership thereof is in the petitioner by virtue of the homestead patent; that the interest of petitioner would not be adequately represented by plaintiff or defendant, and that petitioner is so situated as to be adversely affected by a decision arrived at without the complete presentation of his interest. The petitioner further alleged that his claim involved questions of law which were the same as those involved in the case between the plaintiff and the defendant, and that under the provisions of Rule 24(a) and (b) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, petitioner was entitled to come in. Leave was denied.

We see no error in the ruling. The sole issue in the case was whether the general right of way grant included subsurface minerals. The entire right of way, so far as it rested on the grant, was involved in the suit. The government alleged only that under the act the Great Northern had acquired no interest in the underlying oil deposits, but that these remained the property of the United States, and subject to its control and disposition. In no sense was the interest of the United States adverse to that of MacDonald. For the purpose of the suit the two interests were identical. A decision against the railroad would determine only the basic question, leaving the rights of subsequent patentees of the government to future adjudication. On the other hand, were the holding to be against the government, the decision would mean that the United States retained no mineral rights which it could thereafter have conveyed to the homesteaders and other patentees along the right of way. To that extent, only, petitioner has an obvious interest in the suit and in an outcome favorable to the government.

■ Subdivision (a) of Rule 24, permitting intervention as a matter of right, provides, so far as pertinent here, that the application shall be granted "when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action." Both conditions must be shown to exist. There is no reason to believe that the government's representation of MacDonald's interest is inadequate here, or that it was inadequate below. For that matter, both here and below, he presented an elaborate brief on the merits of the case and was heard thereon as fully as though he had been allowed to intervene. On the whole, the government would seem to have a vastly greater interest in the success of its suit than the intervener. Other patentees along the right

of way have the same claim of right to intervene as MacDonald has. The government argues with much force that to determine subsequent rights it would be necessary to consider numerous types of patents and statutes and many classification orders, all of which would become immaterial if the decision in the main case were adverse. The purpose of the action was to determine once and for all the scope of the 1875 grant, and this ought to be done before an attempt is made to litigate the effect of subsequent patents.

Assuming that denial of leave to intervene under subdivision (b) of the Rule is reviewable, what has been said disposes of that branch of the inquiry.

Affirmed.

WILBUR, Circuit Judge (dissenting).

I dissent. The United States brought this action to enjoin the Great Northern Railway from drilling for and removing oil and gas underlying its right of way upon the ground that the right to develop such oil and gas was not granted by the United States to the defendant Railway Company by the act of March 3, 1875, 18 Stat. 482, 43 U.S.C.A. § 934 et seq., under which the right of way was secured by the St. Paul, Minneapolis and Manitoba Railway Co., which was subsequently conveyed by it to the Great Northern Railway Company. The trial court granted the injunction.

The principal question involved on this appeal is whether or not the act granting the right of way entitled the grantee to use the land within its right of way for the purpose of producing oil.

The title granted by various acts of Congress to railroads for their rights of way is variously referred to as a terminable or base fee, a revocable fee, a fee on condition.

However characterized, the view that the right to develop oil is granted by the private grant of a railroad right of way unless limited to an easement for mere right of passage, is supported by a number of decisions: Nelson v. Texas & P. R. Co., 152 La. 117, 92 So. 754; Crowell & Conner v. Howard, Tex.Civ.App., 200 S.W. 911; Quinn v. Pere Marquette R. Co., 256 Mich. 143, 239 N.W. 376; Brightwell v. International Great N. R. Co., 121 Tex. 338, 49 S.W.2d 437, 84 A.L.R. 265; Kynerd v. Hulen, 5 Cir., 5 F.2d 160; Attorney General v. Pere Marquette R. Co., 263 Mich. 431, 248 N.W. 860, 94 A.L.R. 520; Rice v. Clear Spring Coal Co., 186 Pa. 49, 64, 40 A.

149; Stephenson v. St. L. S. W. R. Co., Tex.Civ.App., 181 S.W. 568; Stevens v. Galveston, H. & S. A. R. Co., Tex.Com. App., 212 S.W. 639; Carter Oil Co. v. Welker, 7 Cir., 112 F.2d 299. Similarly where land is granted for use for school purposes it has been held that the grantee cannot be enjoined from drilling for or removing oil underlying the land. Dees v. Cheuvronts, 240 Ill. 486, 88 N.E. 1011.

We are concerned, however, with the intent of Congress as disclosed by the act of March 3, 1875, supra, making an offer to grant a right of way across public land to any railroad desiring to cross the public domain which complies with the terms of the act concerning the location of its railroad. The immediate question is whether Congress intended to reserve the right to produce oil from the lands within the right of way either for its own use or for conveyance to subsequent patentees or lessees. As stated in the main opinion the government concedes that in many prior grants of rights of way to railroads, it was the intention of Congress to convey a fee "limited only by the possibility of reverter". The view of the courts thus conceded, may be appropriately stated by reference to the decision of the Supreme Court in New Mexico v. United States Trust Co., 172 U.S. 171, 19 S.Ct. 128, 132, 43 L.Ed. 407, where it had under consideration the right of the territory to tax improvements upon the railroad right of way granted by act of Congress of July 27, 1866, 14 Stat. 292, which depended upon the nature of the title granted to the railroad company, one side contending that it gave a mere right of passage and the other that the fee was granted or, if not granted, "such a tangible and corporeal property was granted, that all that was attached to it became part of it and partook of its exemption from taxation." Referring to a prior decision of the Supreme Court on that subject the court said: "So this court in [Missouri, Kansas & Texas] Railway v. Roberts, 152 U.S. 114, 14 S.Ct. 496 [38 L. Ed. 377], passing on a grant to one of the branches of the Union Pacific Railway Company of a right of way 200 feet wide, decided that it conveyed the fee. The effect of this decision is attempted to be avoided by saying that the distinction between an easement and the fee was not raised." In reply to that argument, the court said: "The language of Mr. Justice Field, who delivered the opinion of the court, would be unaccountable else. The difference between an easement and the fee would not

have escaped his attention and that of the whole court, with the inevitable result of committing it to the consequences which might depend upon such difference."

The decision on the subject of the interest granted in the right of way is stated as follows: "But, if it may not be insisted that the fee was granted, surely more than an ordinary easement was granted,—one having the attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and, like it, corporeal, not incorporeal, property."

Some of the acts granting rights of way to railroads prior to passage of the act of March 3, 1875, supra, are as follows:

> Atlantic and Gulf, and Mobile and Ohio, March 3, 1849, 9 Stat. 771, 772.
>
> Illinois Central Grant, September 20, 1850, 9 Stat. 466.
>
> Union Pacific Grant, July 1, 1862, 12 Stat. 489.
>
> Amended Union Pacific Grant, July 2, 1864, 13 Stat. 356.
>
> Northern Pacific Grant, July 2, 1864, 13 Stat. 365.
>
> Placerville Grant, July 13, 1866, 14 Stat. 94.
>
> Leavenworth City Grant, July 23, 1866, 14 Stat. 212.
>
> California & Oregon R. R. Grant, July 25, 1866, 14 Stat. 239.
>
> Atlantic & Pacific R. R. Grant, July 27, 1866, 14 Stat. 292.
>
> Stockton R. R. Grant, March 2, 1867, 14 Stat. 548.
>
> Texas & Pacific R. R. Grant, March 3, 1871, 16 Stat. 573.
>
> Green Bay and Lake Pepin R. R. Grant, March 3, 1871, 16 Stat. 588.
>
> Portland, Dalles & Salt Lake R. R. Grant, April 12, 1872, 17 Stat. 52.
>
> Central Pacific R. R. Grant, Feb. 5, 1875, 18 Stat. 306.

Assuming, then, that during the period in which these earlier acts were passed it was the intent of Congress by the use of the phrase "the right of way through public lands is granted" to grant a fee it follows that it was not the intention of Congress to reserve mineral rights in the right of way but to convey those rights to the Railroad Company. However, it is claimed by the government herein that there was a change in governmental policy shortly be-

fore the passage of the act of March 3, 1875, supra, and that the new policy was against the granting of excessive rights to railroad companies. Assuming that there was a change of attitude or policy on the part of Congress, the use by Congress in the granting act of exactly the same language which had theretofore been used to grant a fee in the right of way would nevertheless conclusively imply an intent of Congress to grant the same rights theretofore granted by use of the same words notwithstanding the assumed change of policy. It is contended by the respondent, however, that the changed purpose of Congress resulted in the incorporation in the act of March 3, 1875, supra, of a sentence which it claims modifies the language of the granting clause of the statute and reduces the estate granted to a mere easement. This language is found in section 4 of the act which is quoted in full in the main opinion. The words relied upon to cause this change are: "And thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way." This phrase, my associates conclude, so limits the effect of the granting clause in section 1 of the act as to grant no more than an easement in the right of way, reserving the fee for future disposition.

I am unable to ascribe such potent effect to the statement in § 4 of the act that subsequent land grants "over which such right of way shall pass" shall be subject to such right of way. It seems to me that this is a mere statement of the obvious priority attaching to prior grants. The qualifying phrase is made necessary in this general offer of a right of way, not because of a change of policy as to the nature of the estate granted but because it was necessary to indicate in some fashion how and when the rights of a railroad company accepting the grant should accrue. Where the act conveyed the land in praesenti it was unnecessary to indicate priorities, because the date of the act fixed the right of the grantee. This was the case of grants to specifically named railroad companies. Consequently, the general right of way of the act of March 3, 1875, supra, provided the manner in which the railroad company should accept the offer contained in the general granting act. I am confirmed in this view by several considerations.

In the first place, on February 5, 1875, 18 Stat. 306, Congress passed an act granting a right of way to the Oregon Central Pacific Railway Company containing the

same clause "and thereafter all lands over which the line of said road shall pass shall be sold, located, or disposed of by the United States, subject to such right of way so located as aforesaid", but the grant is of "a strip of land 100 feet wide, on each side of the central line of said road, through the public lands, and the necessary lands for depots, stations, side-tracks, and other needful uses in operating said road and telegraph, not exceeding twenty acres at any one place." The phrase "a strip of land", so far as I am advised, has always been held to describe the land itself rather than an easement or right of way. We thus have Congress saying that other land grants of the fee shall be subject to such fee. This would indicate not that there was created a dominant and servient estate but that any subsequent grant by the United States whether describing the railroad right of way or not should be held to be subject to the prior grant to the railroad.

The second consideration which leads me to the conclusion that this particular phrase relied upon by plaintiff as diminishing the fee in the right of way to a mere easement does not do so is because I believe the phrase has an entirely different purpose. The railroad in most instances was located upon and across unsurveyed government land. Conseqently, the location of the right of way with relation to subsequent government surveys was impossible of ascertainment and this uncertainty might result in a patent granting lands theretofore granted to the railroad or in adverse possessory claims. The act provides that the railroad company desiring to secure the benefits of the act shall file the location of its railroad "if upon unsurveyed lands, within twelve months after the survey thereof by the United States", etc. It thus appears that both the railroad company and settlers along the line of the railroad are entitled to certain possessory rights which are not defined until after the government survey of the lands involved, which might be years later.

Another reason that leads me to this conclusion is based upon the decision of the Supreme Court in Jamestown & Northern Railroad Co. v. Jones, 177 U.S. 125, 20 S.Ct. 568, 4 L.Ed. 698. It was there held that the Railroad Company could acquire its right of way by the act of March 3, 1875, supra, by constructing its railway over and across public lands without filing of the profile of its railroad as required by § 4 of that act. In reaching this conclusion the court held that the provisions of § 4 applied to the securing of a right of way by the filing of the profile before the railroad was constructed. The Supreme Court adopted the conclusion of the Secretary of the Interior announced in Dakota Central Ry. Co. v. Downey, 8 Land Dec. 115, in which the Secretary held that § 4 is "designed to provide a mode by which fixity of location can be secured to a grantee, in anticipation of that construction by which location is defined in the section making the grant, and which shall have the effect, before the construction of the road, which the terms of the grant limit to the 'central line of said road', which only means—without the fourth section—a constructed road." The court thus affirmed the ruling of the Interior Department that a right of way under the act of March 3, 1875 could be obtained in either of two ways, first, by actually constructing the road upon unsurveyed land, or, second, by filing a profile of the road provided by § 4 in the case of surveyed land; or lands surveyed after the road was located. The court went further than the Interior Department had done by holding that the construction of a railroad across surveyed as well as unsurveyed public lands operated as acceptance of the grant to the Railroad Company and perfected its title to the right of way.

It thus becomes apparent from the decision that the provision in § 4 under discussion relates to priority of title as between the railroad and the possessory rights of homesteaders and others when the railroad's claim is based upon the filing of its profile map, and not to the quality or effect of the grant. · If we assume, as the court decided, that the railroad company also may acquire the right to the right of way by constructing its line without filing a profile map, it is obvious that the proviso in § 4 would not apply because that section relates only to priority in the case of conflicting claims resulting from filing a profile of the railroad. If the grant under § 4 is qualified by the proviso and that under § 1 is not, we would have two different types of estate granted by the same act for the same purpose. This incongruity does not arise if we construe the proviso as applying merely to priority in the case of rights accruing to the railroad company by filing a profile of its road, as I think it must be construed.

The case of Jamestown & Northern Railroad Co. v. Jones, supra, is discussed in two cases by the Supreme Court in which the phrase under consideration is discussed.

Minneapolis, St. Paul & S. S. M. Ry. Co. v. Doughty, 208 U.S. 251, 257, 258, 28 S.Ct. 291, 52 L.Ed. 474; Stalker v. Oregon S. L. R. Co., 225 U.S. 142, 150, 151, 32 S.Ct. 636, 50 L.Ed. 1027, supra. In both of these cases the phrase under discussion is held to deal with the question of priority.

It should be added that Jamestown & Northern Railroad Co. v. Jones, supra, dealt with the claims of a homesteader who had located along the line of the railway and secured a patent from the United States government on May 26, 1893, based upon rights accruing before the filing of a profile map but after the construction of the railroad, covering an entire quarter section without any reservation of the rights of the railroad company, evidently issued because of the ruling of the Secretary that the railroad company could not secure a right of way across surveyed public land by merely constructing its railroad above referred to. This, and other decisions, indicates that there are cases in which the department has intentionally issued subsequent patents covering a portion of the right of way.

Furthermore, it should be noted on this point that the United States land laws relating to the acquisition of land by individuals deal only with public land, that is, with that part of the national domain in the ownership of the government subject to sale or other disposal under the general land laws. The Supreme Court, in October 1875, shortly after the enactment of the act of March 3, 1875, held that a railroad grant did not apply to sections in an Indian Reservation because the absolute title thereto was not in the United States. Leavenworth, etc., R. R. Co. v. United States, 92 U.S. 733, 23 L. Ed. 634. At the same time it held that a similar grant in California did not cover lands wrongly claimed to be in a Mexican land grant, stating that the words "public lands" are used in our legislation to describe such lands as are subject to sale or other disposition under general laws. The declaration in § 4 of the act of March 3, 1875, supra, clearly indicates that the right of way lands are no longer public lands and as such subject to disposal under the general land laws. The decisions cited herein dealing with controversies between mining claimants or homestead claimants and grantees of railroad rights of way are all consistent with the view that such rights of subsequent claimants could not accrue to land granted for a right of way and, consequently, that the owners of lands contiguous to the right of way, or mining claim-

ants within the limits of the right of way could acquire no title to such lands because they were no longer public lands. For these reasons I think the sentence in the fourth section of the act of March 3, 1875 does not affect the character of the right of way granted.

I turn to a consideration of other decisions affecting the question of the nature of the right of way grant. In Rio Grande Ry. v. Stringham, 239 U.S. 44, 36 S.Ct. 5, 6, 60 L.Ed. 136, supra, a patent had been granted to a placer mining claim extending across the railroad right of way without excepting or mentioning the right of way. The contest initiated by the Railroad Company was therefore between the right of way claimed by the company and a fee simple title claimed by the patentee of the placer mining claim. It is true that the courts in adjudicating the rights of the parties, might have awarded the surface to the Railroad Company and the sub-surface mining rights to the placer mining claimant if so advised but the courts did not do this. On the contrary, they defined the right of the Railroad Company as being a limited fee. The Supreme Court held that inasmuch as the lower court had defined the right of the Railroad Company in the exact language of the granting act it had been given all it was entitled to and it was unnecessary to more fully define the right. The definition by the court of the rights of the Railroad Company was in answer to a claim on the part of the Railroad Company that it was entitled to a title in fee simple. The court said its title was not a fee simple absolute but a limited fee and in effect held that the judgment granted them that right. So that the contest between the two claimants for the fee simple was resolved by holding that the Railroad Company held a limited fee with an implied condition of reverter and that it was not necessary to decide whether the reversion would be to the United States or to the placer mining claimant to whom the government had attempted to convey a fee simple absolute. The contest before the court required it to determine the nature of the railroad company's right. That determination, in my opinion, was not dictum. If it could be said that the Supreme Court overlooked the qualifying phrase in § 4 of the act above quoted it might weaken the authority of the decision but that matter was called to the attention of the court and referred to in the opinion, wherein it is said: "What the act relied upon grants to a railroad company complying with its require-

ments is spoken of throughout the act as a 'right of way;' and by way of qualifying future disposals of lands to which such a right has attached, the act declares that 'all such lands over which such right of way shall pass shall be disposed of subject to such right of way.' "

In Choctaw, O. & G. R. R. Co. v. Mackey, 256 U.S. 531, 538, 41 S.Ct. 582, 584, 65 L.Ed. 1076, the Supreme Court had occasion again to give attention to the rights granted by a statute granting a right of way to a railroad company. The statute was the act of Congress of February 18, 1888, ch. 13, 25 Stat. 35, cited and quoted in the footnote to the opinion written by Mr. Justice Brandeis (256 U.S. page 535, 41 S.Ct. 582). A reference to this statute will show that it is much more apt to define an easement than the act of March 3, 1875, which we are considering. The court in that case had occasion to determine whether or not an assessment for betterments could be made by the city on the railroad company's right of way and station grounds. After quoting from Rio Grande Ry. v. Stringham, supra, the court said: "In effect the railroad is the absolute owner of the land." ·

It may have been unnecessary in that case to say more than that the right granted was subject to assessment by the local authorities but the reason given for the conclusion in which the court defines the right granted is not dictum.

In Stepan v. Northern Pac. Ry. Co., 81 Mont. 361, 263 P. 425, 427, the Supreme Court of Montana considered the nature of the right granted by Congress to a railroad company for right of way under the act of March 3, 1875. Subsequent to the location of the right of way a quartz lode or vein was discovered by third persons who sank a shaft on the right of way. After working upon the claim for three years the discoverers applied to the United States for a patent which was granted under the name of "Little Johnnie Lode"; the exterior boundaries of which were wholly within the 100-foot strip on the east side of the railroad track. The plaintiffs abandoned work on the claim after obtaining patent and the shaft caved and became partially filled prior to 1921, when the railroad company shifted its tracks and filled the shaft. The mining claimants sued the railroad company for damages. We thus have a contest between two parties, one claiming under a mineral patent granting the fee simple absolute to the patentee, and the other under a grant to the railroad company of a right of way. The trial court found that the railroad company did not need to use that particular part of the right of way occupied by the shaft and that in shifting its tracks it could have avoided the shaft. Consequently, it held the railroad company was guilty of trespass by filling in the shaft and awarded the stipulated amount of damages, $1,000. The Supreme Court of Montana found it necessary to determine the effect of the act of March 3, 1875, supra, granting a right of way to the railroad company through public lands, and reversed the decision. While it is true that the opinion of the state court, or any federal court other than the Supreme Court, is not binding upon this court, a decision by a state Supreme Court upon the meaning of a federal statute and the interpretation thereof by the Supreme Court are entitled to weighty consideration. Consequently, I quote from that decision wherein the court said:

"* * * while, as to the surface ground of their claim, at least, the plaintiffs [patentees of the mining claim] could have acquired no more than a reversionary interest which would become effective only in the event the railway company ceased to use the strip for the purposes for which it was granted." The plaintiffs contended, however, "that plaintiffs' patent granted an absolute fee to the surface ground on the claim, subject only to the right of way which gave to the railway company the right to use such ground 'to the exclusion of every one, providing the surface was used to facilitate the operations of, or was used for, railroad purposes.' * * *

"Having found that the use to which the surface ground of the Little Johnnie Lode was put was not a railroad purpose, and was not necessary to facilitate the operations of the railroad, the court adopted the theory of plaintiffs, and entered the judgment appealed from.

"If the railroad company had been granted a mere easement over lands thereafter patented to an individual, such individual might acquire the right to use a portion of the right of way by showing that such portion was not used by, nor necessary for the use of, the railroad company. * * *

"However, this grant is more than an easement; it is a base, qualified, or limited fee, and has the attributes of a fee, that is, perpetuity and exclusive use and possession [Citing cases], and the grant itself is a conclusive legislative determination of the rea- ·

sonable and necessary quantity of land to be dedicated to this public use, and carries with it the right to possession in the grantee and the use of the full width of the right of way thus granted, and the railroad company is not limited to so much thereof as it occupies or what is actually necessary for the use for which the grant was made." (Citing cases.)

The court concluded that the plaintiffs "subsequently acquired patent could not pass title to the land, and thereby they acquired no rights in the surface ground at least."

In Stalker v. Oregon Short Line R. R. Co., 225 U.S. 142, 32 S.Ct. 636, 640, 56 L. Ed. 1027, the Supreme Court had under consideration a patent purporting to grant a fee to lands already incorporated in an application for a railroad grant of station grounds under the act of March 3, 1875. The court, speaking of the patent issued to Reed, while the application of the railroad for its right of way and station grounds was still pending, said: "The patent is not an adjudication concluding the paramount right of the company, but in so far as it included lands validly acquired theretofore, was in violation of law, and inoperative to pass title."

Joy v. St. Louis, 138 U.S. 1, 44, 11 S.Ct. 243, 256, 34 L.Ed. 843: "Now, the term 'right of way' has a twofold signification. It sometimes is used to describe a right belonging to a party, a right of passage over any tract; and it is also used to describe that strip of land which railroad companies take upon which to construct their roadbed. Obviously in this paragraph it is used in the latter sense."

As to whether or not a mere surface right is granted to the railroad company in its right of way, it should be said there are a number of other considerations militating against that idea. In the first place, it is hardly believable that the railroad company does not have a right to sink water wells upon the right of way for the purpose of producing water for use in its engines. It is stated by the appellant that thousands of such wells have been dug and no doubt this is true. Furthermore, the railroad company was given the right to take from adjoining public lands "material, earth, stone, and timber necessary for the construction of said railroad." (Sec. 1 of the act of March 3, 1875, supra.) This of course would include the right to extract gravel and stone for ballast, and earth to make fills, timber for bridges. Evidently Congress intended that no lesser right should be granted as to the right of way.

If we hold, as I think we must, that the railroad company would have a right to sink wells for water upon its right of way to be used to make steam in the locomotives operating upon the right of way, it is difficult to conclude that they could not also bore for oil for use in the locomotives for heat and in the machine and wheels for lubrication. In this regard the railroad company states in its brief: "It is common knowledge that the railroads have in fact exercised such rights from the beginning, and have also drilled thousands of wells for the removal of water from beneath the right of way. * * * Water is taken from wells on the right of way for operation and it would be difficult to define a grant in terms that would permit the company to take water but not to take oil for its operating purposes."

With reference to the rulings of the Interior Department I cannot see that they are persuasive as to the legal effect of the act of Congress. The Department was required to make some decisions concerning the granting of patents to land through which the right of way passed and to decide whether such land should be surveyed in squares or otherwise and whether a claimant of such land should pay the price per acre fixed by law for the whole subdivision or with a deduction of an allowance for land contained in the right of way, but it had no power or occasion to pass upon the meaning of the statutory grant of the right of way. Here, be it said, as late as 1930 the Secretary of the Interior, in advocating the passage of the act of 1930 authorizing the development of oil along railroad rights of way, stated in his report to Congress: "The courts have established as a general principle that a right of way is a limited fee on an implied condition of reverter in the case of a nonuser of the land for the purposes for which it was granted." Opinion of C. C. Moore, Commissioner of the U. S. Land Office, forwarded to Congress by Secretary of the Interior Ray Lyman Wilbur, House Reports No. 263, 71st Congress, 2nd Session. With this statement I fully agree, but I do not agree with the conclusion of the Commissioner also included in the Report that Congress had a right to authorize the exploitation of the oil under-

lying the right of way on behalf of the United States.

I conclude that the right granted the railroad company was more than a mere easement, that the grant was of the fee subject to the conditions implied by the nature of the grant namely, that it should be used by the grantee, or its successors for the purpose for which it was granted, that is, for railroad purposes, and that when no longer so used, or if not so used at all, the title thereto reverted to the government. Therefore, I am of opinion that at least so long as the oil developed from the right of way, or its equivalent, is used as fuel or lubricant to operate trains over the right of way, it is used for railroad purposes. I would modify the decree accordingly.