**A. J. MYERS**

v.

**The UNITED STATES.**

**Walter James WEAVER et al.**

v.

**The UNITED STATES.**

**Nos. 366–63, 367–63.**

United States Court of Claims.
June 9, 1967.

Bailey E. Bell, Tulsa, Okl., attorney of record, for plaintiffs.

David D. Hochstein, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on October 10, 1966. Exceptions to the commissioner's findings and recommended conclusion of law were filed by the plaintiff and the case was submitted to the court on the brief of the plaintiff and oral argument of counsel, defendant having submitted pursuant to Rule 62(b) without exceptions and brief. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiffs are, therefore, not entitled to recover and their petitions are dismissed.

Commissioner Bernhardt's opinion,* as modified by the court, is as follows:

These consolidated companion cases were originally filed in the United States District Court for the District of Alaska against the United States under the Federal Tort Claims Act (28 U.S.C. § 1346 (b)). The District Court dismissed the complaints (Myers v. United States, 210 F.Supp. 695 (D.Álaska 1962)). On appeal they were remanded to the district court with the suggestion that they be transferred to the Court of Claims under 28 U.S.C. § 1406(c), for the reason that as reputed "inverse condemnations" they properly lay under the Fifth Amendment to the Constitution and the Tucker Act (28 U.S.C. § 1491), rather than the Federal Tort Claims Act. Myers v. United States, 323 F.2d 580 (9th Cir. 1963). On December 9, 1963, the district court entered an order transferring the cases to this court, where the plaintiffs filed their respective petitions on January 23, 1964, under 28 U.S.C. § 1491.

The petitions present in common a question of the defendant's right to widen

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

and partially reroute a public road pursuant to provisions in land patents issued to plaintiffs reserving to the Government rights-of-way for roads, etc., constructed or to be constructed. The plaintiffs contend that the reserved easement for right-of-way was fully exercised by a road across their properties preexisting their respective patents, and that a widening and relocation of that road in 1959 constituted an inverse condemnation for which they are entitled to payment of just compensation. They point to Notices of Allowance of their applications for homestead grants, preceding the patents, which in each case described the property to be conveyed as "Subject to 50′ easement on either side of the center line for local road", and say the Government could not exceed that margin without condemnation proceedings. The defendant rests on the literal terms of the applicable statute and the reserved rights-of-way in the patents, as these and similar reserved rights-of-way have been judicially construed in analogous situations.

The Wasilla-Big Lake Road was constructed in 1949 on then Government-owned land in Alaska. It curved through the northern halves of two contiguous parcels of land later patented separately to plaintiffs Myers and Weaver, respectively, in 1954 and 1956, containing 160 and 155 acres, in that order. Each of these homestead grants included the segment of road running through it (P.L. Order 757, 16 Fed.Reg. 10549), but each reserved to the United States as grantor a "right-of-way for roads, roadways, highways, tramways, trails, bridges, and appurtenant structures constructed or to be constructed by or under the authority of the United States or by any State created out of the Territory of Alaska, in accordance with the act of July 24, 1947 (61 Stat. 418, 48 U.S.C. sec. 321d)."

Order No. 2665, entitled "Rights-of-Way for Highways in Alaska", which was promulgated by the Secretary of the Interior on October 16, 1951 (16 Fed.Reg. 10752) pursuant to the Act of June 30, 1932, as amended (48 U.S.C. § 321a et seq. (1946)), classified the Wasilla-Big Lake Road as a local road and reserved a right-of-way easement in the lands 50 feet on either side of the center line of the road as then constructed, which had an actual surfaced width of 18 to 20 feet at that time. Amendment No. 2 to Order No. 2665, dated September 15, 1956 (21 Fed.Reg. 7192), reclassified the road in question from a local road to a through road, which had the effect of authorizing expansion of the right-of-way easement to 300 feet for roadbuilding purposes.

In 1959, after due notice was given to plaintiffs and other affected property owners, the Government widened, paved, and partially relocated the road. The new road, including adjacent fills and cut slopes (collectively the so-called road "prism"), extended from 68 feet south to 132 feet north of the center line of the old road, for a total width of 200 feet as contrasted to the 100-foot right-of-way easement which the old dirt-and-gravel road had traversed. The expansion to a width of 200 feet involved an increase of 18 feet to the south side and 82 feet to the north side of the previous 100-foot right-of-way. The new road exactly followed the course of the old road across Myers' property, but halfway across Weaver's property it spurred off the route of the old road for 2,165 feet, rejoining it subsequently on a neighboring property. The abandoned part of the old road remained, but was not maintained.

Amended complaints by these plaintiffs claim compensation of $52,483.20 (Myers) and $63,979.20 (Weaver) arising from the construction of the new road. Myers' petition comprises separate claims for obstruction of access to his garden, taking of gravel, frustration of plans to install a gasoline filling station and of plans to subdivide and sell residential lots, impairment of his restaurant business due to interference with his means of ingress, egress, and parking, despoliation of trees, obstruction of property by contractor's equipment, loss of two business signs, and a loss in resale value of his property. Weaver's petition presents claims for expropriation of

gravel, impairment of access to his home and garden due to grade alterations affecting his driveway and a trail road through his property, taking of land occupied by the widened and diverted road, frustration of a proposed garden business, littering of his premises with overburden, boulders, and test holes, and general damage to his property. The plaintiffs do not suffer from modesty in the amounts they claim. Certain of these claims the plaintiffs made no effort to prove; others they proved inadequately; for none are they entitled to recover because of the state of the applicable law. The accompanying findings present those facts afforded by the record. An effort will be made to condense them here.

First, as to Myers. Alongside the old road he had a quonset hut residence, an unpretentious coffeeshop seating 14 at the counter plus a few more in two booths, a garage, greenhouse, outdoor toilet, and a shed. Across the road he had a three-acre quondam garden. The coffeeshop attracted a few customers from passing traffic en route to or from nearby Big Lake in the summer months. Cars, many hauling boat trailers, would pull in to Myers' parking area from the old road at any place within a distance of 400 running feet. The old road was flush with his parking area, which could hold as many as six cars with boat trailers. It was not demonstrated that the coffeeshop ever made a profit, and undoubtedly it did little or no business in the winter months since for two complete winters Myers closed up when he vacationed in the "lower 48".[1] Myers' facilities were within the 200-foot right-of-way for the new road. In order not to disturb Myers, and to save the Government the cost of paying him for the removal of his improvements, the right-of-way plans for the new road were altered to bypass or jog around Myers' place, by means of narrowing the right-of-way by 67 feet for a 220-foot stretch along the highway. Even so this concession shrank Myers'

parking area somewhat, to the point where it would accommodate only two cars with boat trailers, instead of six as before. Moreover, the new road when it was completed was from three to five feet higher than the parking area, so purportedly in the slippery winter months with ice and snow on the ground cars had difficulty in climbing up onto the new highway from the parking area. It is somewhat difficult to appreciate that cars equipped for winter weather in Alaska would be unable to overcome this type of obstacle, assuming there were cars patronizing the coffeeshop in the dead of an Alaskan winter.

Myers subdivided and sketched a plat for eight lots on the northern fringe of his property bordering the old road. The widened new road necessarily decreased the maximum depth of his proposed subdivision lots to an extent where he abandoned the idea, after purportedly finding a purchaser for one lot who backed out of the transaction before leaving a deposit or signing a sales contract, allegedly for the reason that the altered lot was too shallow. The plat was never recorded. It is concluded that Myers' plan to sell lots was genuine but tentative, and that whatever depth was removed from the lots as laid out resulted entirely from the widening of the road to 200 feet.

It is also claimed that the curtailment of the available parking area put an end to Myers' plans to install a gasoline filling station, although these plans had ripened only to the point of Myers making preliminary informal inquiries at the Texaco office (re a franchise) and the Small Business Administration (re a loan). The plan, if such it was, was so tentative and unproven that it amounted to only frustrated future hopes rather than the deprivation of property rights *in esse* required to support a claim of taking.

The same might be said for the three-acre garden across the road, which

---

1. A term in vogue in Alaska when referring to the 48 States of the United States exclusive of Alaska and Hawaii.

Myers had cleared a few years earlier, had unsuccessfully sown to oats in 1958, and intended in 1959 to plant to onions and radishes for commercial sales, when the widening of the road temporarily closed his entrance into the garden. The obstruction consisted of a temporary earth berm pushed up by defendant in the course of excavating the new road. A bulldozer could have cut an entrance through into the garden in short order, and in fact the offer to do so was made but Myers never advanced his garden plans to the point of obtaining tilling equipment, so the defendant delayed until July before cutting the entrance through. Actually, Myers had never worked his garden on a commercial scale before 1959, nor has he since. It is unlikely that he had serious intentions of doing so in the summer of 1959, particularly in view of his admission that he is no farmer, had no equipment, and failed to request the contractor to perform the offered and relatively easy service of bulldozing an entrance way into his garden whenever he wanted it done. There is no evidence of any arrangements having been made in 1959 to plant the garden in commercial quantities and, of course, there were no crops that year for whose elimination the Government would be required under the applicable statute to reimburse Myers. His claim for lost 1959 crops was on a "but for" basis.

Finally, Myers contends that in building the new road the defendant removed an estimated 18,836.4 cubic yards of gravel from his property for which he is entitled to payment. All of this gravel was removed from an area within the Government's 300-foot right-of-way, and almost all of it was removed from the 200-foot right-of-way which was exercised in building the new road. For reasons which will become apparent in the forthcoming discussion of the law applicable to the case, no such activities by the Government in the lawful exercise of its reserved right-of-way can result in a recovery. The same is true as to the interferences with Myers' parking area

and entrance into his coffeeshop, described earlier, all of which occurred within the planned right-of-way area, altered for the reasons mentioned.

The Weaver claim is slightly different. His house and garage were fairly level with the old road, but the new road was 11 feet lower. Thus, the 200-foot driveway from the old road up to Weaver's garage terminated in an 11-foot cliff at the new roadside and became inaccessible without regrading. The defendant regraded the driveway so it debouched level with the new road, and widened the entrance, but the regrading increased the gradient from 1 percent to 6.5 percent. This was satisfactory during most of the year, but after a fresh snowfall it became impossible to negotiate with a car unless Weaver first shoveled off the snow. This was not too frequent, two or three times in one winter, he said, but there is his other testimony to the contrary. If his access was blocked for protracted periods during the bad weather this might occasion a valid claim, but we must accept his admission in the record that it happened that way only two or three times in one winter, even though his other testimony sharply increased the frequency rate.

Weaver cleared a garden area adjacent to his house in the spring of 1959, intending to grow radishes and onions, and raise chickens, for sale. Customary access to his garden area was by an old trail road some distance west of his driveway but still on his property. The cutting of the new road intersecting the old trail road serving Weaver's property and garden area left the entrance to the old trail road on a bank several feet higher than the new road, and thus inaccessible to motorized farm equipment. For some reason that is not explained in the record the Government did not regrade the terminus of the old trail road so that equipment could mount it from the new highway. However, it also appears that the garden area was accessible from the top of Weaver's driveway leading to his garage, so it would have been possible for him to have

gained access in that way if he seriously wanted to. Weaver became ill in the spring of 1959, and it is this more than anything else which explains his failure to go ahead with plans to grow commercial crops in his garden.

The Weaver petition presents other claims. A large one is for gravel removed from his property for use by the Government in building the new road. A good part of the gravel came from regrading the driveway, but this was for Weaver's benefit, and besides most of the gravel removed from that source must have come from somewhere within the 300-foot right-of-way easement which the Government had reserved the right to exercise. Another part of the gravel claim represents gravel removed from those parts of Weaver's property through which the new road was cut after it branched off from the old road halfway through Weaver's property. Since this gravel was ostensibly within the 200-foot right-of-way easement which the Government was exercising in cutting the new road through, this could not base a claim because of the legal problems to which we shall come later.

Weaver wanted to sell gravel to the Government contractor for the new road, and at his request the contractor dug 15 or 20 test holes, only to find the gravel unsuitable. The contractor refilled all but three or four of these test holes, which he left unfilled at Weaver's request. Since the entire operation was done for Weaver's benefit and at his request, this could hardly support a claim against the Government. On another occasion Weaver asked the contractor to bulldoze onto his property the topsoil from an adjacent excavation area for the new road. The contractor skimmed off the overburden as requested, but it was, of course, a conglomeration of trees, rocks, tundra, flora, and some inextricable topsoil. No doubt a bull-dozer lacks finesse sufficient to segregate topsoil from overburden, even if this had been the agreement. Here again the Government cannot be held to account for the consequences of a private arrangement between the contractor and Weaver just because it did not turn out as expected and left portions of Weaver's property littered with unusable debris, including sizable boulders. Weaver's final claim is for the diminishment of the value of his property in general by reason of the circumstances as they have been described.

These facts present two principal legal issues:

(1) Whether section 21(d) (7) of the Alaska Omnibus Act, 73 Stat. 146 (1959), which repealed the Act of July 24, 1947, ch. 313, 61 Stat. 418, is to be given a retroactive construction thus nullifying the reservation of the rights-of-way contained in the 1947 Act and in the land patents granted to the plaintiffs.

(2) Whether the specific language contained in the "Notices of Allowance" preceding the patents, to the effect that the properties were subject to a 50-foot easement on each side of the center line of the local road, limits the defendant's rights-of-way to that extent, notwithstanding the general terms of the statute incorporated in the land patents granted to the plaintiffs.

The plaintiffs contend that since the Act of July 24, 1947 was repealed by section 21(d) (7) of the Alaska Omnibus Act, both supra, prior to the institution of their present suits, the defendant is restricted to the Notices of Allowance and the land patents themselves in determining the extent of the rights-of-way for roads and highways which it reserved across plaintiffs' properties.[2] Since the reservations for roads in the patents did not purport to fix the width or location of the roads, the plaintiffs would limit the defendant's rights-of-

---

2. The land patents in suit also expressly reserved rights-of-way for ditches or canals under the Act of August 30, 1890 (26 Stat. 391, 43 U.S.C. § 945), and for railroads, telegraph and telephone lines under the Act of March 12, 1914 (38 Stat. 305, 48 U.S.C. § 305 (1952)), in addition to certain mineral rights under section 5 of the Act of August 1, 1946 (60 Stat. 760, 42 U.S.C. § 1805 (1952)).

way to the 100-foot limits specified in the Notices of Allowance.

In repealing the Act of July 24, 1947, supra, the Alaska Omnibus Act was operative only prospectively and did not disturb the application of the repealed Act to earlier transactions. This is consistent with the normal standard of statutory interpretation which prevails in the absence of a clear and explicit intention to the contrary. Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); Fairchild Engine & Airplane Corp. v. United States, 285 F.2d 131, 132, 152 Ct.Cl. 352, 355 (1961); 2 Sutherland, Statutory Construction, § 2201 (3rd Ed. 1943). The language of section 21 of the Alaska Omnibus Act did not in any way indicate a congressional intent to revoke or cancel rights-of-way reserved in patents issued prior to July 1, 1959, the effective date of the repeal. The legislative history of the Act reveals no such intention. Cf. dissenting opinion in State, Dept. of Highways v. Crosby, Alaska, 410 P.2d 724 (1966). In construing the effect of a public grant, it is the established rule that the law in force at the time the grant is made governs. United States v. 3.08 Acres of Land, etc., 209 F.Supp. 652, 656 (N.D. Utah, 1962). See 1 Sutherland, supra, § 2044. Thus, it is clear that the Alaska Omnibus Act of 1959 did not affect the rights-of-way reservations contained in those patents issued pursuant to the Act of July 24, 1947.

Turning to the second question as to whether the 100-foot easement specified in the Notices of Allowance issued to the plaintiffs imposed a permanent limit on the defendant's exercise of the rights-of-way reservations in the patents, this presents two subordinate inquiries, namely: first, whether the construction of the old road in 1949 across the public domain constituted an exercise of the reservation created by the Act of July 24, 1947, and contained in the plaintiffs' patents, and second, if so, whether the reservations neverthe-less licensed the defendant to enlarge or reroute the earlier road.

Plaintiffs rely principally on Hillstrand v. State of Alaska, 181 F.Supp. 219 (D.Alaska 1960), review denied, Alaska, 352 P.2d 633 (1960), in contending that the construction of the old road in 1949 was an exercise of the reservation and was preclusive of any further exercises. In *Hillstrand* it was held that, although the Act of July 24, 1947 was without limitation as to the initial exercise of the reservation by either the Federal or State Government, once the rights-of-way had been selected and defined, later improvements necessitating the utilization of land upon which the road was not already located, must be accomplished pursuant to condemnation proceedings. Later, after a trial, the Alaska Superior Court departed from this position and accepted the contrary ruling of Judge Plummer in Myers v. United States, 210 F.Supp. 695 (D.Alaska 1962). See Hillstrand v. State of Alaska, Superior Court for the State of Alaska, Third Judicial District, No. A–16, 205, Memorandum of Decision, dated Sept. 6, 1963. As noted above, the decision in the *Myers* case was nullified when on remand from an appeal the district court transferred the matter to this court for jurisdictional reasons, but the district court record in the *Myers* case comprises 90 percent of the record before this court, where a trial was held on the separated issue of liability.

The plaintiffs' patents included the land over which the old road was constructed in 1949. At the time of its construction the United States owned the land and needed no reservation for its right-of-way. But when the land encompassing the road was conveyed to the plaintiffs, the United States then was required to, and indeed did, reserve rights-of-way expressly which constituted an exercise of the reservation. This was so because a public road was in existence traversing the land conveyed. Moreover, the Notices of Allowance to the plaintiffs expressly made

the properties subject to the local road which was described as an "easement". By definition "An easement is a right of one in the land of another. It is not the land itself." Kennecott Copper Corp. v. United States, 347 F.2d 275, 294, 171 Ct.Cl. 580, 613 (1965). However, the words "easement" and "right-of-way" have been used interchangeably by the courts in treating statutes reserving rights-of-way in favor of the United States. See Northern Pac. Ry. Co. v. United States, 277 F.2d 615, 618 (10th Cir. 1960).

It then becomes pertinent to inquire whether the United States can exercise its reservation more than once. House Report No. 673 of the 80th Congress, June 24, 1947 (U.S.Code, Cong.Serv., 1947, p. 1353), which reported the 1947 Act under review, consistently referred to the term "rights-of-way" across public lands in the Territory of Alaska in the plural, as did the reprinted letter from the Department of the Interior endorsing the legislation, as if in recognition of the fact that extensive road-building activity was anticipated across public land as well as across homestead grants and other privately owned lands. The letter from the Department of the Interior analogized the legislation to the Act of August 30, 1890 (26 Stat. 391, 43 U.S.C. § 945), reserving rights-of-way for ditches and canals constructed by the United States, and to the Act of March 12, 1914 (38 Stat. 305, 48 U.S.C. § 305 (1946)), reserving rights-of-way for railroads in patented lands in Alaska. Both of these last two statutory reservations are expressly set out in the land patents issued to our plaintiffs. One of them expressed the right-of-way as covering "ditches or canals constructed by the authority of the United States.", and the other as covering "a right of way for the construction of railroads, telegraph and telephone lines." This is to be contrasted with the language of the 1947 Act under consideration which reserves a right-of-way for "roads * * * constructed *or to be constructed* by or under the authority of the United States. * * *." (Emphasis supplied.) Note that the italicized terminology in the last-mentioned statute specifically refers to present or future roads and in the plural form, whereas the Act of August 30, 1890, supra, as to rights-of-way for ditches and canals omits specific reference to those to be constructed in the future. Despite this, the Supreme Court in Ide v. United States, 263 U.S. 497, 501, 502, 44 S.Ct. 182, 183, 68 L.Ed. 407 (1924), interpreted the narrower statute in the following words:

> * * * But we think the contention [i. e., that the reservation in the patent there in issue directed to canals and ditches "constructed *or to be constructed*" was void to the extent that it exceeded the statutory language relating to canals and ditches "constructed"] ascribes to the direction a narrower scope than Congress intended it should have. The officers of the land department, as the patents show, regard it as comprehending all canals and ditches constructed under the direct authority of the United States, whether the construction precedes or follows the issue of the patent. * * * Of course the direction must be interpreted in the light of the circumstances which prompted it, and when this is done the conclusion is unavoidable that the direction is intended to include canals and ditches constructed after patent issues quite as much as those constructed before. All courts in which the question has arisen have taken this view. [Citations.]

It is no longer open to doubt that the United States has reserved rights-of-way in the cases before us which may come into existence subsequent to the issuance of the deed or patent. The legislative history of the 1947 Act, cited earlier, evidences congressional concern with the instances where it might be necessary to expend Federal funds and cause litigation delays in obtaining rights-of-way for public roads in Alaska which would cross lands once owned by the United States. This concern ex-

tended to the obvious situation where a person who acquired land under the homestead laws would later be in a position to demand just compensation from the Government, except for the intentional wording of the statute preventing such claims. The unpredictability of road requirements in the then frontier Territory of Alaska, both as to location, size and number, makes it logical to conclude that Congress foresaw the exact situation demonstrated by the present cases in framing the 1947 Act. This construction of the 1947 Act not only comports with the undoubted intent of Congress, but also complies with the general rule of law that "grants from the sovereign should receive a construction favorable to the claim of the government rather than that of the grantee." MacDonald v. United States, 119 F.2d 821, 825 (9th Cir. 1941), mod. sub. nom., Great Northern Ry. Co. v. United States, 315 U.S. 262, 272, 62 S.Ct. 529, 86 L.Ed. 836 (1942).

■ At the least, the Government can exercise its reservation once after the land goes into private ownership. "Since the land over which the road was constructed was public domain in 1949 the United States needed no reservation for its right-of-way." Myers v. United States, supra, 210 F.Supp. at 700. The later widening of the road was the first exercise of the reservation after the plaintiffs acquired the land. We need not decide, therefore, what are the limits, if any, on the repeated exercise of the Government's reservation.

It follows that the Notices of Allowance do not in any way confine or limit the property interest of the Government in the right-of-way reservations in the plaintiffs' patents. The petitions must be dismissed.